■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v HARRY JAMES HALL, Appellant.—Appeal by the defendant from a judgment of the County Court, Dutchess County (Hillery, J.), rendered June 8, 1982, convicting him of manslaughter in the first degree as a juvenile offender, upon his plea of guilty, and imposing sentence. The appeal brings up for review the denial, after a hearing, of that branch of the defendant's motion which was to suppress his first confession to the police.

Ordered, that the judgment is reversed, on the law and the facts, that branch of defendant's motion which was to suppress his first confession to the police is granted, and the matter is remitted to the County Court, Dutchess County, for further proceedings on the indictment.

On this appeal, the defendant contends that the suppression court erred in denying that branch of his motion which sought to suppress an oral confession made to the police prior to his being administered his *Miranda* warnings. After a thorough review of the record of the suppression hearing, we agree with the defendant that at the time he made the confession in issue he was in custody, that his confession was the product of police interrogation, and that, since he was not given prior warnings as mandated by *Miranda v Arizona* (384 US 436), his confession must be suppressed.

During the evening hours of August 16, 1981, the defendant, who was then 15 years old, arrived at the house of a neighbor, Sergeant John McLain of the New York State Police, and reported that his sister had been stabbed. After conducting a preliminary investigation at the Hall residence and summoning aid, McLain returned to his own residence where he questioned the defendant briefly as to what had occurred. At that point, the defendant related an exculpatory account in which he told of discovering his sister's body and then observing a man dressed in black fleeing from the house. McLain relayed this information to the police officers who had then arrived at the scene, and returned to his home to obtain a

written account from the defendant. He also determined that the defendant's parents were in Connecticut and efforts were being made to contact them.

Approximately 45 minutes later, Senior Investigator John D. Crodelle arrived at the McLain residence and questioned the defendant for about 15 minutes. The defendant repeated the story which he had previously related to McLain. Following this questioning, Crodelle proceeded to the Hall residence where, together with Lieutenant Thomas Neilon, who was in charge of the investigation, he inspected the crime scene. After their inspection both he and Neilon came to the conclusion that because of a number of discrepancies between what they had observed at the scene and the defendant's story, it was impossible for the events to have occurred in the manner in which the defendant had related them. Thereupon, the two investigators returned to the McLain residence where, together with Sergeant McLain, they took the defendant into a small room and began to interrogate him for approximately one hour. The questioning was conducted primarily by Inspector Crodelle. At the outset, Crodelle pointed out the numerous flaws in his story to the defendant, and told him that he should tell the truth. When the defendant adhered to his original story, Crodelle again pointed out the inconsistencies between that story and what the investigation had revealed. He had the defendant repeat the story four or five times, and each time the defendant adhered to his original story. Crodelle admitted that, while he could not say he suspected that the defendant had stabbed his sister, he did suspect that the defendant knew something beyond what he was revealing, and that was why he persisted in repeatedly questioning him.

After being questioned repeatedly on the same points for about one-half hour, the defendant began to ask Crodelle a number of hypothetical questions concerning what might happen to the person who committed the crime if he were caught. Specifically, he asked where that person would be incarcerated, whether that person would be permitted to play basketball where he was incarcerated, and whether the matter would be reported in the press. After repeating these questions a couple of times, the defendant shifted the form of the questions and began asking what would happen to him if he were the one who had killed his sister, but at the same time denying that he did it. He asked where he would be incarcerated and whether he would be allowed to play basketball. He asked again whether it would appear in the newspapers. He also asked whether, if he admitted the killing, his

neighbors would find out. Crodelle told him they would. Admittedly, it was clear to Crodelle at this point, from the nature of the questions, that the defendant had some involvement in the killing of his sister. Crodelle then posed a hypothetical question to the defendant, as to where he thought the person who committed the crime would have hidden the knife, and the defendant said in the bedroom.

Shortly thereafter, the defendant asked for a glass of water and McLain left to get it for him. After McLain returned with the water, and the defendant finished drinking it, he paused and then admitted that he had stabbed his sister and proceeded to give a full confession. According to Crodelle, he was not asking questions at this point; rather, the defendant was speaking out.

Thereafter, the defendant was taken to his own house where he was detained until his father arrived. A further written confession obtained from defendant at that time was suppressed by the hearing court on he ground that there was no proper waiver of his *Miranda* rights. The court found, however, with respect to the first oral confession, that the defendant was not in custody at the time it was made and therefore denied that branch of the defendant's motion which was for its suppression. We disagree.

In determining whether a suspect was in custody at the time of the police questioning and therefore entitled to receive preinterrogation *Miranda* warnings, the test is not what the defendant thought, but rather what a reasonable man, innocent of any crime, would have thought had he been in the defendant's position *(see, People v Yukl,* 25 NY2d 585, 589; *see also, People v Kwok T.,* 43 NY2d 213). The confession herein was elicited at the end of a one hour questioning session of a 15-year-old boy, confined in a small room with three police officers. During that questioning, the police challenged the defendant's version of the events and compelled him to repeat his story over and over, each time pointing out the flaws. Surely, as the session wore on, it must have become apparent to the defendant that he had become a suspect and was not free to simply terminate the questioning and leave *(see, People v Oramus,* 25 NY2d 825). Nor can we accept the People's contention that the defendant's admission was spontaneous because it was not made in response to any specific question by the police. It is clear that the defendant's statement was the product of and induced by the interrogation process, and not a spontaneously volunteered statement *(see, People v Stoesser,* 53 NY2d 648; *People v Maerling,* 46 NY2d 289).

It is quite apparent that the conduct of the police in this case was not designed simply to elicit the defendant's version of the events to assist in their investigation. They had already obtained that version both orally and in writing prior to removing the defendant to the room in the McLain house. Rather it is obvious that the police, armed with certain inconsistencies in his story, sought to isolate the defendant, a 15-year-old youth, and, through the use of persistent questioning, obtain a confession to the crime. This court has repeatedly stated that the law will not tolerate police conduct aimed at isolating a youthful suspect from his family or other supportive adults *(see, People v Cavagnaro,* 88 AD2d 938; *People v Harrell,* 87 AD2d 21; *cf. People v Spivack,* 111 AD2d 884).* We cannot accept the People's argument that Sergeant McLain, as the defendant's neighbor, was acting as a supportive adult or surrogate parent during the interrogation. To the contrary, he was clearly functioning as a police officer. Indeed, the record indicates that McLain was recommended for a commendation by Crodelle for his efforts in the case. In making such recommendation, Crodelle noted that in light of the defendant's age and the fact that his parents were unavailable, McLain's actions preserved a delicate piece of evidence, and that he played an intricate part in obtaining the necessary evidence which proved the defendant's guilt. It is also worth noting that even though the defendant's father called the McLain residence during the early part of the interrogation, the police did not inform him that they were in the process of questioning his son nor did they inform the defendant that his parents had called *(see, People v Townsend,* 33 NY2d 37).*

It is well recognized that over and beyond the ordinary constitutional safeguards provided for adults subjected to questioning, the police must exercise greater care to insure that the rights of youthful suspects are vigilantly observed *(see, Haley v Ohio,* 332 US 596).* In this case, the police stepped beyond the bounds of permissible conduct in their efforts to isolate the youthful suspect and obtain a swift confession and, accordingly, that confession must be suppressed and the matter remitted for further proceedings.

In light of our determination we need not reach the additional point raised by the defendant concerning the limitation of his right of cross-examination during the hearing. Lazer, J. P., Bracken, Brown and Kooper, JJ., concur.