■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v MICHAEL ALAIRE, Appellant.—Appeal by the defendant from a judgment of the County Court, Westchester County (Cowhey, J.), rendered March 13, 1984, convicting him of murder in the second degree, arson in the second degree and assault in the first degree, upon a jury verdict, and imposing sentence. The appeal brings up for review the denial, after a hearing, of those branches of the defendant's omnibus motion which were to suppress statements made by him.

Ordered that the judgment is reversed, on the law and the facts, that branch of defendant's omnibus motion which was to suppress his statements to the police prior to the administration of *Miranda* warnings is granted, and a new trial is ordered.

In the early morning hours of July 9, 1982, a fire broke out in a cottage housing 14 children, including the defendant, at the Leake and Watts Children's Home (hereinafter the Home), a residential treatment center for emotionally disturbed children. The fire resulted in the death of one resident, and caused serious physical injury to another.

The defendant, who was then 16 years old, had been diagnosed a chronic schizophrenic, with a borderline-retarded intelligence quotient in the lowest 6% of the population. He had not progressed beyond the third-grade level and possessed only a rudimentary knowledge of the outside world. The police interviewed the defendant on the morning of the fire, but his comments at that time were entirely exculpatory in nature. He explained that he escaped the fire by opening his bedroom door and crawling down the hallway to safety.

On July 14, 1982, after learning from arson investigators that the fire had two points of origin, one in the defendant's room and the other in an adjoining room occupied by a resident called Willie, Detective Ryan, who had been assigned to investigate the case, sought and obtained permission of officials at the Home to take both the defendant and Willie to the station house for questioning. The two boys, accompanied by Lynn Millheiser, an administrator of the Home, were driven to the station house by two detectives. Millheiser instructed the youths to cooperate with the police in discussing the events on the night of the fire. Although Detective Ryan explained his reasons for wanting to speak with the youths on the way to the station house, he did not ask whether they had voluntarily agreed to come to headquarters or tell them that they did not have to come to headquarters.

Upon his arrival at the precinct, the defendant was taken into the detective squad room, while Willie was directed to wait in a separate office. As he was escorted into the squad room, the defendant observed several detectives, some of whom were armed, walking around. Millheiser and three officers were present during the defendant's interview which lasted for about 1½ hours. At no time during the course of the interview was the defendant administered *Miranda* warnings, advised that he might refuse to answer questions, or that he was free to leave. The questioning was conducted primarily by Detective Ryan with the assistance of Millheiser, who rephrased questions which the defendant was unable to understand.

For over an hour, the defendant adhered to the exculpatory version of the events which he had previously related to the police on the morning of the fire, repeatedly stating that he had observed flames only in the hallway and outside of his window. Nevertheless, Detective Ryan persisted in questioning the defendant because he believed that the defendant was not being truthful in omitting reference to the fact that there had been a fire in his room. As the interview progressed, the defendant evinced a clear awareness of his status as a suspect, demonstrated by a number of hypothetical questions he raised concerning the fate of the arsonist. Specifically, the defendant asked whether the arsonist would have to go to jail and was assured by Detective Ryan that "everything would be done to help the person responsible". The defendant also asked whether Detective Ryan believed that he had set the fire and noted that he sometimes did things, like walking in his sleep, without realizing it. The defendant repeatedly stated that he

was unhappy at the Home and asked whether he would be returned there if he set the fire. Millheiser indicated that she would make inquiry about alternate living arrangements. The defendant then asked whether he would be considered responsible for the murder of the youth who died in the fire, if in fact he had set the fire. Both Millheiser and Detective Ryan assured him that the person who set the fire did not intend to kill anyone, but that it was an accident.

At approximately 1:00 P.M., the defendant stated that he was hungry. Sergeant Bianco left the room to purchase lunch, closing the door behind him, while Detective Ryan continued the questioning. Ryan then confronted the defendant with the fact that there had been two fires in the cottage that morning and asked him to attempt to recall whether he had observed a fire in his room. The defendant denied the presence of a fire in his room, asserted that the fire had started in Willie's room, and again asked Detective Ryan whether he was a suspect. Detective Ryan responded that he "thought that anyone who was upset enough and who wanted to draw attention to himself could possibly start a fire without intending to hurt anyone else" and urged him to "get it off his chest". The defendant then stated: "I didn't mean to hurt anybody". Detective Ryan bluntly asked him if he had set the fire, eliciting the defendant's affirmative response. At that point, the defendant was advised of his *Miranda* rights and placed under arrest.

Sometime after the defendant made his statement to Detective Ryan, Joanne Fentor, the social worker assigned to the defendant, arrived at the police station and was taken into the room where the defendant was seated with Millheiser. Fentor had been the defendant's counselor since he arrived at the Home. When Sergeant Bianco returned with the lunches at about 1:30 P.M., Detective Ryan advised him that the defendant had made admissions and was under arrest. Sergeant Bianco entered the office where the defendant was seated with Fentor and Millheiser, gave them their lunches, and sat at his desk to eat his lunch. Shortly thereafter, Sergeant Bianco heard a banging sound. He turned and saw the defendant, who was about four feet away from him banging his fist on the table. Sergeant Bianco then heard the defendant say "I killed George, I killed George by setting the fire".

Millheiser did not recall this incident or statement. She only recalled that the defendant denied any involvement in the incident while speaking to Fentor. Fentor, on the other hand, testified that the defendant did admit his involvement

in the fire, but then denied it, saying that he did not mean to hurt George or John, although she did not recall the specific words that he used.

On appeal, the defendant argues that the hearing court erred in denying those branches of his omnibus motion which were to suppress the statements he made during the police interrogation, since, at the time those statements were made, the defendant was in custody and had not received the benefit of preinterrogation warnings as mandated by *Miranda v Arizona* (384 US 436). We agree. Under the totality of the circumstances presented by this case, we find that the interrogation of the defendant was custodial, since a reasonable person of 16 years of age, innocent of any crime, and in the position of the defendant, would have believed that "his freedom had been infringed upon in a significant way" *(Matter of Chad L.,* 131 AD2d 760, 761; *People v Bodner,* 75 AD2d 440, 447). The defendant, along with one other youth, was singled out from among his peers at the Home and removed to the police station by two detectives and an administrator of the Home for the express purpose of interrogation. At the station house, the defendant was separated from his young companion and taken into a room where he was questioned in the presence of several detectives with the active participation of the administrator. The defendant was compelled to repeat his exculpatory version of the facts and repeatedly asked to search his memory for additional details concerning that fateful evening. Even when the defendant announced that he was hungry, the questioning did not cease, nor was he excused. Rather, Bianco indicated that he would bring lunch to the interrogation room and went to purchase food, closing the door behind him. Detective Ryan chose this moment to confront the defendant with the fact that he knew that there had been a fire in defendant's room. The removal of the defendant from his familiar environment to the police station, where he was questioned without respite for more than an hour, most certainly created a coercive atmosphere from the viewpoint of this mentally disturbed and mentally deficient 16-year-old youth and would have substantially indicated to a reasonable person innocent of any crime, in the defendant's position, that he was a suspect and was not free to simply stop answering questions and leave *(see, People v Yukl,* 25 NY2d 585, 589; *People v Hall,* 125 AD2d 698, 700).

We cannot accept the People's claim that the defendant was not a suspect and therefore not in custody at the time of the police interrogation. It is well established that " 'special care

must be taken to insure the rights of minors who are exposed to the criminal justice system' " *(People v Ventiquattro,* 138 AD2d 925, 927, quoting from *People v Ward,* 95 AD2d 351, 354; *see also, In re Gault,* 387 US 1) and that the police are expected to "exercise greater care to insure that the rights of youthful suspects are vigilantly observed" *(People v Hall,* 125 AD2d 698, 701; *see also, Haley v Ohio,* 332 US 596). There can be little doubt that Detective Ryan considered the defendant a suspect. Although the police had already questioned the defendant on July 9, 1982, at the Home, Ryan removed the defendant to the station house for questioning after learning that the defendant's room was a point of origin of the fire. Ryan knew that the defendant's prior statement had denied the presence of a fire in his room. He was also aware that, prior to being committed to the Home, the defendant had spent time in a mental institution. During the course of the interview, Detective Ryan observed that the defendant rocked back and forth and that his hands and legs shook. Moreover, as the questioning progressed it would have become evident that the defendant's thought processes were not those of a normal 16 year old, that he suffered from paranoid delusions, and that he was extremely anxious to please the detectives and Millheiser. Thus, it is quite apparent that Ryan's persistent questioning of the intellectually impaired and mentally ill defendant was not designed merely to gather information to assist in the arson investigation, but rather to elicit a confession. The defendant's severe mental illness and limited intellect should have indicated to the authorities that he was in need of a supportive adult or counsel at the interrogation *(see, People v Ward,* 95 AD2d 351, *supra; Matter of Michelet P.,* 70 AD2d 68, 71).

The fact that the police interrogation occurred contemporaneously with the elicitation of inculpatory evidence by Millheiser further contributed to the coercive custodial environment *(see, e.g., People v Jones,* 47 NY2d 528; *People v Benedict V.,* 85 AD2d 747). Not only does the record fail to support the People's claim that Millheiser was acting as a supportive adult on behalf of the defendant, it reveals that Millheiser was acting in cooperation with the police *(see, People v Ray,* 65 NY2d 282; *People v Jones,* 47 NY2d 528, *supra; People v Esposito,* 37 NY2d 156; *People v Warren,* 97 AD2d 486, *appeal dismissed* 61 NY2d 886). Millheiser had been assigned as a social worker to both fire victims with whom she had daily contact and had developed positive relationships. She had also worked extensively with the family of the burn victim. In

contrast, Millheiser knew the defendant only in the context of her position as an administrator at the Home and did not have daily contact with him. She was aware of the fact that there had been two fires and conceded that at the time of the interrogation she wanted to determine who was responsible. Millheiser also admitted that the Home had been advised by counsel to fully cooperate with the police and that she accompanied the defendant to the police station in her capacity as an employee of the Home, which conflicted with her duty as a trained social worker to be supportive of the defendant. Even more disturbing is the fact that Millheiser, who recognized that the defendant considered her to be his protector, actively participated in the interrogation and led him to believe that he would not suffer any consequences if he was the arsonist. Even when it became obvious that the defendant was about to incriminate himself, Millheiser did not request that the defendant be advised of his rights, she did not seek to terminate the questioning, and she did not attempt to obtain the advice of counsel. Instead, she "expressly assumed the role of parental protector and, in furtherance of that role, encouraged defendant to make a confession" *(People v Benedict V.,* 85 AD2d 747, *supra).*

In view of the circumstances surrounding the defendant's encounter with the police, we find overwhelming evidence that a reasonable person, innocent of any crime, would have believed himself to be in custody and not free to leave. This conclusion is reinforced when the defendant's schizophrenic condition, intellectual immaturity, and demonstrated anxiety are taken into consideration. Thus, the questioning of the defendant by the police without the *Miranda* safeguards was in derogation of his constitutional rights mandating suppression of the resultant inculpatory statements *(see, e.g., Matter of Julian B.,* 125 AD2d 666, 669 [Kooper, J., concurring]; CPL 60.45).

The second statement made by the defendant and overheard by Sergeant Bianco, however, does not fit within the same framework. As to this statement, we are in agreement with the People's contention that the defendant's statement, "I killed George, I killed George by setting the fire", was a spontaneous, voluntary statement made by the defendant. The record demonstrates that this statement was made to Fentor, the defendant's assigned counselor, who was not acting in any capacity other than as a surrogate parent for this defendant, a role that she had filled since his admission to the Home. Unlike Millheiser, who held an administrative position with

the Home, Fentor was primarily concerned with the defendant and the protection of his interests. It is clear that Fentor was not acting as an agent of the police. Therefore, this statement, even though made by the defendant while in custody, was simply not the product of police interrogation and suppression was properly denied by the hearing court (see, *People v Miller,* 137 AD2d 626, 629; *People v Wiesner,* 129 AD2d 753; *People v Graham,* 120 AD2d 674, *lv denied* 68 NY2d 757; *see,* CPL 60.45 [2] [b] [ii]; *People v Ray,* 65 NY2d 282, 286; *People v Bracy,* 98 Misc 2d 346, *affd sub nom. People v DePasquale,* 75 AD2d 751, *affd* 54 NY2d 693; *cf., People v Warren,* 97 AD2d 486, *appeal dismissed* 61 NY2d 886, *supra).* The fact that this statement was overhead by Sergeant Bianco does not render it inadmissible since there is no evidence in the record to indicate that Bianco attempted in any way to deliberately overhear the defendant's conversation (see, *People v Harris,* 57 NY2d 335, 342).

Although the statement made by the defendant to Fentor implicates the social worker-client privilege (CPLR 4508), which protects communications made by a client to a social worker that are intended to be confidential, in this case, the defendant's statement was made in the presence of a third party, namely, Sergeant Bianco, and Sergeant Bianco's presence was known to the defendant. In view thereof, it cannot be said that the defendant intended his statement to be confidential and thus, the privilege did not attach (see, Richardson, Evidence § 413 [Prince 10th ed]; 8 Wigmore, Evidence § 2311 [McNaughton rev]; *People v Harris, supra,* at 343).

Moreover, contrary to the defendant's contentions, the second statement, made after the administration of *Miranda* warnings, is not so tainted by the first custodial statement as to warrant suppression. Two distinct theories have been advanced to sanction the suppression of a second statement preceded by proper *Miranda* warnings after a custodial statement has been elicited in the absence of warnings. The so-called "cat-out-of-the-bag" theory, as set forth in *People v Tanner* (30 NY2d 102, 105-106), is summarized as follows: "A man who makes admissions under duress or in violation of his constitutional right to warning and advice may feel so committed by what he has then said that he believes it futile to assert his rights after he has been later advised of them before new questioning begins. This state of mind may have an effect on the waiver leading to the latter admissions; or on the voluntary nature of those admissions." The application of this theory depends on a determination of the state of the

defendant's mind when he made the second statement. This is a fact question, and since the defendant did not testify at the hearing, there is no factual basis for concluding that the latter statement was tainted by the earlier one (see, People v Newson, 68 AD2d 377, 389).

The second theory, set forth in People v Chapple (38 NY2d 112, 114-115), is premised not on the defendant's subjective motivations, but upon objective, external events. In Chapple, the court held that a second statement must be suppressed if it is part of a continuous chain of events, beginning with an interrogation without warnings producing an inadmissible statement, followed by warnings and further interrogation resulting in a subsequent statement. Following the decision of the United States Supreme Court in Oregon v Elstad (470 US 298), which determined that the police procedures held improper in People v Chapple (supra) did not violate Federal constitutional standards, the Court of Appeals reinstated the Chapple rule as a matter of New York State constitutional law (People v Bethea, 67 NY2d 364). However, in Bethea, the court explained that its decision was in furtherance of the general prophylactic effect of the exclusionary rule, that is, the deterrence of improper police conduct. The court said: "We conclude that the mandate of NY Constitution, article I, § 6 that '[n]o person * * * shall * * * be compelled in any criminal case to be a witness against himself' would have little deterrent effect if the police know that they can as part of a continuous chain of events question a suspect in custody without warning, provided only they thereafter question him or her again after warnings have been given" (People v Bethea, supra, at 366).

Since the police interrogation in this case ceased once Detective Ryan placed the defendant under arrest, the Chapple-Bethea rule does not come into play, nor should it. The second statement was not the result of any improper police conduct so as to merit the application of the exclusionary rule. The meeting between the defendant and Fentor was arranged at Fentor's request as the surrogate parent of the defendant. It was not part of any police plan or expectation to obtain further admissions from the defendant. Certainly the police are not required to silence a talkative defendant or to close their ears to spontaneous statements made to others within their hearing.

The defendant's contention that his admissions should be suppressed because he lacked the mental capacity to make a reliable statement is unpersuasive. The mere fact that a

defendant suffers from a mental illness, and/or possesses limited intellectual capacity, is not sufficient to warrant the suppression of an otherwise admissible statement. Suppression should be granted only when it appears that a defendant was unable to appreciate the nature and consequences of his statement *(see, People v Schompert,* 19 NY2d 300, 305, *cert denied* 389 US 874; *People v Woods,* 89 AD2d 1022). In this case, the hearing court found that the defendant's statement, as overheard by Sergeant Bianco, was entirely trustworthy and reliable and was not subject to suppression by reason of the defendant's mental condition. This finding is supported by the record. The suppression court properly considered the fact that the defendant had twice been found competent to stand trial *(see, Blackburn v Alabama,* 361 US 199; *People v Brown,* 86 Misc 2d 339). Furthermore, a psychiatrist called by the defendant at the suppression hearing opined that this statement, made to Fentor and Millheiser, was voluntary and not coerced.

Accordingly, we conclude that while the hearing court erred in denying that branch of the defendant's omnibus motion which was to suppress the defendant's statements made prior to the issuance of his *Miranda* warnings, the hearing court properly denied suppression of the defendant's statements made to Fentor. Mollen, P. J., Thompson, Rubin and Sullivan, JJ., concur.