■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v MARTIN TANKLEFF, Appellant. [606 NYS2d 707] —Appeals by the defendant from two judgments of the County Court, Suffolk

County (Tisch, J.), both rendered October 23, 1990, convicting him of murder in the second degree (two counts; one count as to each indictment), upon jury verdicts, and imposing sentences. The appeals bring up for review the denial, after a hearing, of that branch of the defendant's omnibus motion which was to suppress his statements to the police.

Ordered that the judgments are affirmed.

At approximately 6:17 A.M. on the morning of September 17, 1988, two police officers responded to a home in Belle Terre, New York, where they discovered the body of Arlene Tankleff, who had been beaten and stabbed to death, and Seymour Tankleff, who had been severely beaten and stabbed, but who was still breathing. Seymour Tankleff was taken to the hospital, where he later died.

At 9:20 A.M., the defendant arrived at police headquarters. At 9:40 A.M., two detectives started to question the defendant. The defendant initially provided an exculpatory version of events of that morning and had, in fact, accused another person of the crimes in question. However, at approximately 11:45 A.M., one of these two detectives, James McCready, devised a stratagem in order to test the defendant's veracity. This stratagem took advantage of the fact that the defendant's father Seymour Tankleff had initially survived and had been taken to the hospital.

At 11:45 A.M., Detective McCready staged a telephone call to the hospital and pretended to be party to a nonexistent telephone conversation, during the course of which he said, in a voice loud enough to be overheard, "Yeah, John, yeah. You're kidding? No kidding, he came out. Okay. Thanks a lot." McCready then advised the defendant that Seymour Tankleff had come out of a coma and had accused the defendant of being the assailant. McCready testified, "I told him that his father told Detective Pfalzgraf [stationed at the hospital] that he, Marty, was the one who did this to his father; that he beat and stabbed his father". No *Miranda* warnings had been given at this point.

The defendant's first response was to attempt to reconcile his prior exculpatory version with his father's putative accusation. He said, "If my father said that, that's because I'm the last person he saw". The second detective, Norman Rein, then stated, "Marty, maybe your father was conscious when you came in and stabbed him". At this point, the defendant volunteered to take a lie detector test, but his request was refused. Detective Rein continued the questioning by asking,

"What do you think we should do to the person who did this to your mother and father?" At this point, the defendant responded, "Whoever did this needs psychological help". After this statement, the defendant continued speaking. He asked, "Could I have blacked out and done it?" Detective Rein then asked whether the defendant thought he had blacked out. The defendant responded by stating, "that it wasn't him, but it was like another Marty Tankleff that killed them." Then the defendant asked, "Could I be possessed?" and Detective Rein responded "Marty, I think that's what happened to you". Finally, at approximately 11:54 A.M., the defendant said, "It's coming to me". At this point, Detective McCready intervened and administered the *Miranda* warnings. At approximately 11:56 A.M., the defendant made a full confession.

On appeal, the defendant's first argument is that his confession was extracted from him in violation of his privilege against self-incrimination under the Federal and State Constitutions (US Const 5th, 14th Amends; NY Const, art I, § 6). Specifically, he argues that the police subjected him to a custodial interrogation in violation of the rule announced in *Miranda v Arizona* (384 US 436). We disagree.

A suspect is not entitled to receive a recitation of his *Miranda* rights unless he is in police custody. In New York, the question whether a suspect is in police custody is to be determined with reference to the question whether an ordinary person, innocent of any crime, would, in the defendant's position, think that he was free to leave *(see, e.g., People v Yukl,* 25 NY2d 585; *see also, People v Centano,* 76 NY2d 837; *People v Hicks,* 68 NY2d 234; *Matter of Kwok T.,* 43 NY2d 213; *People v Rodney P.,* 21 NY2d 1).* Applying this standard, the County Court found that the defendant was not in custody until after he had made the ambiguous statements noted above and until after he had been advised of his *Miranda* rights. We agree with this finding.

The defendant was clearly not in custody when he arrived at police headquarters at 9:20 A.M. Even assuming that the police suspected the defendant at this point, neither the defendant himself nor a reasonable person, innocent of any crime, would have known of these suspicions. The defendant accused a third party of committing the murders, and he most likely would have believed that his presence at the police station was required, not because he was a suspect, but because he was a crucial witness. That Detective McCready later used a ruse to cause the defendant to believe that there was inculpatory evidence against him (his father's purported

hospital bed statement) "ha[d] nothing to do with whether the [defendant] was in custody for the purposes of the *Miranda* rule" *(Oregon v Mathiason,* 429 US 492, 496 [custody status unaffected by police officer's deceptively telling defendant of inculpatory evidence]; *see also, Illinois v Perkins,* 496 US 292). Therefore, we find that the defendant's having made the cryptic statements noted above without having had the benefit of *Miranda* admonitions does not require suppression of the subsequent confession.

The defendant also contends that his confession should have been suppressed because it was the product of a police-orchestrated ruse. We agree that the weight of the evidence establishes that it was Detective McCready's spurious telephone call to the hospital, followed by his deceptive report to the defendant as to the supposed content of the bogus telephone call, which in fact prompted the defendant to confess. However, it is also clear to us that the type of trickery employed by Detective McCready in this case was not likely to provoke an unreliable confession; on the contrary, we find that the factual reliability of the defendant's confession was, if anything, enhanced by the nature of the particular ploy which was used to elicit it. Needless to say, we give no credence to the defendant's claim that he confessed because he was "brainwashed". The stratagem employed by the police in this case was, in short, not so fundamentally unfair as to have deprived the defendant of his due process rights *(see, People v Tarsia,* 50 NY2d 1; *People v Brewley,* 192 AD2d 540; *People v Hassell,* 180 AD2d 819; *People v Collins,* 156 AD2d 703; *People v Sohn,* 148 AD2d 553).

The defendant also argues that there was insufficient evidence to support the jury's verdict finding him guilty of "depraved mind" murder with respect to the death of his mother Arlene Tankleff, and that this verdict is inconsistent with the one finding him guilty of intentional murder with respect to the death of his father Seymour Tankleff. These related arguments are meritless.

While it is true that a person cannot commit a single homicidal act while entertaining two inconsistent mental states *(see, People v Gallagher,* 69 NY2d 525 [defendant cannot simultaneously both have the conscious intent to kill and lack the conscious intent to kill]) the obvious fact in the present case is that the defendant engaged in two separate acts and two separate courses of conduct, that is, the killing of his mother and the killing of his father. Clearly, it was possible

for him to have had two different mental states at these two different times.

We agree with the defendant to the extent that he argues that the evidence presented by the prosecution is far more consistent with the conclusion that he intended to kill his mother than with the jury's conclusion that he killed her recklessly. However, we are not free to vacate a conviction based on a finding of recklessness merely because we ourselves consider that a finding of intent would have been more plausible in light of the evidence. The present case is certainly not the first one in which such a circumstance has arisen *(see, e.g., People v Applegate,* 176 AD2d 888; *People v Abney,* 173 AD2d 545; *People v Santana,* 163 AD2d 495, *affd* 78 NY2d 1027; *People v Curry,* 158 AD2d 466 [cases where evidence would have supported finding of intent yet jury opted for finding of recklessness]). The jury's conclusion that the defendant lacked a conscious objective to kill while he was beating his mother to death is not irrational, and should be upheld *(cf., People v Gonzalez,* 160 AD2d 502).

We have examined the defendant's remaining contentions and find them to be without merit. Bracken, J. P., Sullivan and Pizzuto, JJ., concur.

O'Brien, J., dissents and votes to reverse the judgment, on the law and the facts, to grant that branch of the defendant's omnibus motion which was to suppress his statements to the police, and to dismiss the indictments, with the following memorandum, with which Eiber, J., concurs. Based upon the totality of the circumstances, and giving particular consideration to the youth of the defendant, I conclude that the defendant was subjected to custodial interrogation without the benefit of the *Miranda* warnings and, therefore, his confession should be suppressed.

At the time of the murders, the defendant was still a minor and special care should have been taken to ensure that his rights were protected *(see, People v Alaire,* 148 AD2d 731; *People v Ventiquattro,* 138 AD2d 925; *People v Ward,* 95 AD2d 351; *see also, In re Gault,* 387 US 1; *Haley v Ohio,* 332 US 596). Instead, the police improperly isolated the defendant from his family for the purpose of interrogation *(see, e.g., People v Ventiquattro,* 138 AD2d 925, *supra; People v Hall,* 125 AD2d 698), questioned him in an increasingly accusatory manner for hours without advising him of his *Miranda* rights, and employed a ruse to extract inculpatory statements. As the questioning progressed over the course of the morning, no

reasonable person of 17 years of age, in the defendant's position, and innocent of any crime, would believe that he was free to leave the presence of the police *(see, People v Yukl,* 25 NY2d 585, *cert denied* 400 US 851; *People v Alaire,* 148 AD2d 731, *supra; People v Hall, supra).* The defendant was continuously under police control from approximately 6:30 A.M., which was shortly after the first police officers arrived at the Tankleff house, until 11:54 A.M., when he was finally given the *Miranda* warnings.

Within about 15 minutes of the arrival of the police at his home at about 6:17 A.M. on September 17, 1988, the defendant was separated from his brother-in-law, the only relative present, because the police did not want them to "contaminate each other's story". The defendant was told to remain in a police car and was questioned intermittently by various police officers for approximately two hours concerning the discovery of his parents' bodies. While at the Tankleff house, the police would not permit the defendant to wash blood from his hands or to enter the house to obtain a pair of shoes. At 8:35 A.M., the police took the defendant from his house to police headquarters, and there is no dispute that the police considered him a suspect at that point. At police headquarters, the defendant was placed in a small room, where he was questioned by two detectives without interruption for over two hours. He was subjected to increasingly accusatory questioning, as the detectives inquired as to gaps in his story, such as why there was blood on the light switch in his room, why he did not see his mother the first time he went into her darkened room, and why he did not have more blood on his body. The defendant was asked to demonstrate how he moved his wounded father out of a chair. At one point, the defendant was told that his explanation was "ridiculous". Detective McCready testified that he was aware that the defendant's immediate family members were available at the hospital where Mr. Tankleff was being treated and that, before proceeding to police headquarters with the defendant, Mr. Tankleff's attorney had given him a telephone number where he could be reached. Furthermore, it is apparent from the testimony elicited from the defendant's sister, which the court found credible, that family members were led to believe that the police would bring the defendant to the hospital from his home.

Even assuming, arguendo, that the defendant was not in custody during the initial interrogation at police headquarters, it must be concluded that once Detective McCready

falsely advised the teenaged defendant that his father had identified him as the assailant, no reasonable, innocent person who found himself identified as the perpetrator in this manner would have believed that he was free to leave. Consequently, it is clear that by this point, the defendant was in custody. Moreover, even after employing the ruse, the interrogating detectives continued to question the defendant without the benefit of *Miranda* warnings until he began to break and give inculpatory statements. It was only at this point, after the defendant admitted the possibility that he could have been the individual who killed his parents, that the detectives advised him of his constitutional rights.

Under these circumstances, the issuance of the *Miranda* warnings to the defendant shortly after the ruse was insufficient to dissipate the taint of the previous improper police conduct, as the defendant was subjected to continuous custodial questioning *(see, e.g., People v Chapple,* 38 NY2d 112; *People v Daniels,* 189 AD2d 892; *People v Anderson,* 178 AD2d 605). The rule with respect to *Miranda* warnings is that "[l]ater is too late, unless there is such a definite, pronounced break in the interrogation that the defendant may be said to have returned, in effect, to the status of one who is not under the influence of questioning" *(People v Chapple, supra,* at 115).

A comparison between the facts of this case and the facts in *People v Hall* (125 AD2d 698, *supra)* in which this Court suppressed the defendant's confession, demonstrates that the conduct of the police in this case was more egregious. In *Hall,* the 15-year-old defendant was the only other person at home when his sister was stabbed to death. He was questioned for an hour by three police officers in the house of one of the officers, during which the officers pointed out inconsistencies in his story. Here, as in *Hall,* "as the session wore on, it must have become apparent to the defendant that he had become a suspect and was not free to simply terminate the questioning and leave" *(People v Hall, supra,* at 700). Moreover, in *Hall,* unlike here, the police officers did not use a ruse to extract a confession.

I am mindful that the findings of the hearing court are accorded great deference on appeal *(see, People v Prochilo,* 41 NY2d 759), and here the hearing court found that the People's witnesses were credible. Nevertheless, even accepting the truth of the prosecution's proof, I conclude that the record fails to support the hearing court's determination that the defendant was not in custody prior to administration of the *Miranda* warnings. In view of the absence of any other

evidence connecting the defendant to the murders, except for the confession which he disavowed at the trial, the indictments should be dismissed.

Finally, even if I agreed with my colleagues that the confession should not be suppressed, I would dissent and vote to grant the defendant a new trial based on the court's error in permitting the prosecutor to comment during summation on the defendant's failure to call his sister and brother-in-law as witnesses. Generally, once a defendant comes forward with evidence, the prosecution may comment on his failure to call an available witness whose testimony may be material and who is under his control (see, People v Rodriguez, 38 NY2d 95, 98; People v De Jesus, 42 NY2d 519, 525). However, here the defense counsel objected to such comments and alerted the court that the defendant's sister and brother-in-law were not under the defendant's control. In fact, they were cooperating with the prosecution prior to the trial. Under the circumstances, the prosecutor's comments were unfair and, in view of the evidence, cannot be considered harmless beyond a reasonable doubt.