**Martin H. TANKLEFF, Petitioner,**

v.

**D.A. SENKOWSKI, Superintendent, Clinton Correctional Facility, Phillip Coombre, Jr., Acting Commissioner N.Y. State Department of Correctional Services, Dennis C. Vacco, Attorney General, Respondents.**

No. 96–CV–0507 (TCP).

United States District Court,
E.D. New York.

Jan. 19, 1997.

Warren L. Feldman, Rogers & Wells, New York City, for Petitioner.

### MEMORANDUM AND ORDER

PLATT, District Judge.

Petitioner MARTIN TANKLEFF has filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.

Petitioner seeks the writ on the grounds that (1) the trial court erred by introducing statements made by petitioner to the detectives in violation of *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and its progeny; (2) petitioner's statements to the police were "involuntary, unreliable, and uncorroborated and, accordingly, the Fourteenth Amendment prohibited their use against him at trial"; (3) the jury was unconstitutionally selected because (a) petitioner was not present during the pre-screening process conducted in the judge's chambers and (b) he was not allowed to challenge the prosecutor's use of peremptory strikes against all potential African–American jurors in violation of *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), and *Powers v. Ohio*, 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991); (4) the prosecution withheld material that it was obligated to turn over to petitioner pursuant to *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); and (5) the prosecution's summation was "in bad faith" and violated petitioner's due process right to a fair trial.

### PRIOR PROCEEDINGS

On October 23, 1990, following a jury trial in Suffolk County Court (Tisch, J.), petitioner was convicted of one count of Intentional Murder in the Second Degree, in violation of New York Penal Law Section 125.25, subdivision 1, for the killing of his father, Seymour Tankleff, and one count of Depraved Indifference Murder in the Second Degree, in violation of New York Penal Law Section 125.25, subdivision 2, for the killing of his mother, Arlene Tankleff. Thereafter, he was sentenced to two consecutive indeterminate terms of incarceration of twenty-five years to life.

By Decision and Order dated December 27, 1993, the New York Supreme Court, Appellate Division, Second Judicial Department (by a 3–to–2 majority vote) affirmed the trial court's judgment of conviction. *People v. Tankleff*, 199 A.D.2d 550, 606 N.Y.S.2d 707 (2nd Dept.1993).

By Order dated February 10, 1994, Associate Justice O'Brien granted petitioner leave to appeal to the Court of Appeals.

By Order dated December 22, 1994, the Court of Appeals unanimously affirmed the

**154**

Appellate Division's Order of Affirmance, *People v. Tankleff*, 84 N.Y.2d 992, 993–994, 622 N.Y.S.2d 503, 646 N.E.2d 805 (1994), which led to the filing of the instant application for a writ of habeas corpus on February 7, 1996. For the reasons stated herein, petitioner's application must be denied.

### STATEMENT OF FACTS

After three State court decisions, this Court presumes a certain familiarity with the factual background; accordingly, the Court will only provide a summary of the facts. Having reviewed the record, this Court concurs with the factual findings of the State courts. *See Purkett v. Elem*, 514 U.S. 765, 115 S.Ct. 1769, 1771, 131 L.Ed.2d 834 (quoting 28 U.S.C. § 2254(d)(8) and citing *Marshall v. Lonberger*, 459 U.S. 422, 432, 103 S.Ct. 843, 74 L.Ed.2d 646 (1983) ("In habeas proceedings in federal courts, the factual findings of state courts are presumed to be correct, and, absent some procedural error, may be set aside 'only if they are not fairly supported by the record.' ")).

At approximately 6:17 a.m. on September 17, 1988, two police officers responded to a 911-telephone call in Belle Terre, New York. Upon arriving at the home of petitioner, the police discovered petitioner, soiled with blood, and the bodies of Arlene and Seymour Tankleff. Arlene Tankleff had been beaten severely and stabbed to death; Seymour Tankleff had been beaten severely and stabbed, but was still breathing. An ambulance took Seymour Tankleff to the hospital, where he died shortly thereafter.

At approximately 9:20 a.m., petitioner volunteered to accompany the police to the station house. At 9:40 a.m., detectives K. James McCready and Norman Rein began questioning him. Initially, petitioner provided an exculpatory version of events and accused Jerry Steuerman, Seymour Tankleff's former business partner, of the crimes in question. At approximately 11:45 a.m., however, McCready devised a stratagem to test petitioner's veracity.

This stratagem took advantage of the fact that Seymour Tankleff initially had survived and had been taken to the hospital. Detective McCready staged a pseudo telephone call to the hospital to which Seymour Tankleff had been taken and said, in a voice loud enough to be overhead, "Yeah, John, yeah. You're kidding? No kidding, he came out. Okay. Thanks a lot." (Tr. at 2887–2888, 3486–3487.) McCready then advised petitioner that Seymour Tankleff had come out of a coma and had accused petitioner of being the assailant. McCready testified, "I told him that his father told Detective Pfalzgraf (stationed at the hospital) that he, Marty, was the one who did this to his father; that he beat and stabbed his father." (Tr. at 2887, 3486, 3819–20.) At this time, the detectives had not advised petitioner of his constitutional rights to counsel and to remain silent.

Petitioner's first response was to attempt to reconcile his prior exculpatory version with his father's putative accusation. He said, "If my father said that, that's because I'm the last person he saw." (Tr. at 2887, 3487.) Detective Rein then stated, "Marty, maybe your father was conscious when you came in and stabbed him." (Tr. at 2887.) At this point, petitioner volunteered to take a lie detector test, but the police refused his request. (Tr. at 3823.) Detective Rein continued the questioning by asking, "What do you think we should do to the person who did this to your mother and father?" (Tr. at 3487.) At this point, petitioner responded, "Whoever did this needs psychological help." (Tr. 2287–88, 3487–88, 4156.) After this statement, petitioner continued speaking. He asked, "Could I have blacked out and done it?" (Tr. 2887, 3487.) Detective Rein then asked whether petitioner thought he had blacked out. Petitioner responded, "that it wasn't him, but it was like another Marty Tankleff that killed them." (*Id.*) Then petitioner asked, "Could I be possessed?" and Detective Rein responded "Marty, I think that's what happened to you." (*Id.*) Finally, at approximately 11:54 a.m., petitioner said, "It's coming to me." (Tr. at 2887–88, 3487–88.) At this point, Detective McCready intervened and advised petitioner of his constitutional rights. At approximately 11:56 a.m., petitioner made a full confession. (Tr. 2892, 3490, 4156.)

## DISCUSSION

### I. PETITIONER'S CONFESSION

Petitioner contends that his confession violated his Fourteenth Amendment rights because he was not given his *Miranda* warnings until 11:54 a.m. and his statements were not voluntarily made. The government counters that petitioner was not subject to custodial interrogation until the time of his inculpating admissions and that the admissions were voluntary.

### A. *Right to Warnings Under Miranda*

■ To raise a violation of one's rights under the Fourteenth Amendment, a defendant must have been compelled to testify after affirmatively raising a "valid claim of the privilege." *Minnesota v. Murphy,* 465 U.S. 420, 427–28, 104 S.Ct. 1136, 79 L.Ed.2d 409 (1984). Under *Miranda v. Arizona,* 384 U.S. 436, 479, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), however, a defendant subject to "custodial interrogation" must be warned of his constitutional rights before being questioned. Custodial interrogation and the accompanying protection of *Miranda* are implicated when "a suspect's freedom of action is curtailed to a 'degree associated with formal arrest.'" *Berkemer v. McCarty,* 468 U.S. 420, 440, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984) (quoting *California v. Beheler,* 463 U.S. 1121, 1125, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983) (per curium)).

In *United States v. Kirsh,* 54 F.3d 1062 (2d Cir.1995), the Second Circuit Court of Appeals described custodial interrogation as follows:

> The test used in determining whether a defendant was in custody is an objective one that (a) asks whether a reasonable person would have understood herself to be 'subjected to restraints comparable to those associated with a formal arrest,' and (b) 'focuses upon the presence or absence of affirmative indications that the defendant was not free to leave.'

*Id.* at 1067(quoting *Campaneria v. Reid,* 891 F.2d 1014, 1021, n. 1 (2d Cir.1989)).

■ In the instant case, it is clear that prior to 11:54 a.m., when petitioner stated that it was "coming" to him, petitioner's *Miranda* rights were not implicated, because he was not subject to custodial interrogation. In so finding, this Court is mindful of the recent Supreme Court decision that held that State-court determinations of "in custody" do not qualify for a presumption of correctness under Section 2254(d) because such rulings do not resolve "a factual issue" and thus warrant independent review by the federal habeas court. *Thompson v. Keohane,* 516 U.S. 99, 116 S.Ct. 457, 465, 133 L.Ed.2d 383 (1995). In *Thompson,* the Court held that the "in custody" determination required two discrete inquiries: (1) what were the circumstances surrounding the interrogation? and (2) given those circumstances would a reasonable person have felt he was not at liberty to terminate the interrogation and leave? *Id.* 116 S.Ct. at 464. The first inquiry is purely factual. *Id.* at 464 ("State-court findings on these scene and action-setting questions attract a presumption of correctness under 28 U.S.C. § 2254(d).") The second inquiry, however, requires an application of the controlling legal standard to the historical facts.

After reviewing the transcripts from the suppression hearings, the entire State Record, the extensive Memoranda submitted to this Court, this Court concurs with the three State courts and holds that a reasonable, innocent person in petitioner's position would have believed that he was free to terminate the interrogation and to leave. This determination was based on the circumstances as they unfolded, not merely on whether or not petitioner's initial contact with the police was voluntary. Since petitioner was not in custody until the time of his inculpating admissions, the State court correctly admitted his statements into evidence.

### B. *Voluntariness of Petitioner's Statements*

■ Statements which are made voluntarily are not barred by the Fourteenth Amendment. Thus, a confession will be admissible over Fourteenth Amendment objections if the government proves by a preponderance of the evidence that a confession was given voluntarily. *United States v. Diaz,* 891 F.2d 1057, 1057 (2d Cir.1989). Voluntariness

is "determined after a careful evaluation of the totality of all the surrounding circumstances, including the accused's characteristics, the conditions of interrogation, and the conduct of law enforcement officials." *United States v. Anderson,* 929 F.2d 96, 99 (2d Cir.1991).

■ Examining the totality of the circumstances, the Court finds that petitioner's statements were made voluntarily, thus precluding suppression for violation of his Fourteenth Amendment rights. Petitioner was a sophisticated and above average high school student who was considering entering college at the time of the murders. Moreover, there was no credible evidence of physical or psychological coercion which could have overborne petitioner's will and rendered his statements involuntary.

## II. *THE JURY SELECTION*

Petitioner asserts that there were "two separate and substantial violations of constitutional rights" (Mem. of P. & A. in Supp. of the Pet. of Martin H. Tankleff for a Writ of Habeas Corpus Pursuant to 28 U.S.C. § 2254 at 107) (hereinafter "Pet's Mem.") that "serve as independent grounds for vacating [his] state court convictions." (*Id.* at 106.) First, petitioner was not present when potential jurors were questioned in the trial judge's chambers. Second, petitioner maintains that the trial judge did not allow him "to challenge the prosecution's discriminatory-appearing use of its peremptory strikes against all potential African–American jurors, in violation of his constitutional right to do so under *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), and its progeny." (*Id.* 107). The Court will address each in turn.

### A. *Petitioner's Absence During the Pre–Screening*

■ Petitioner alleges that the jury pre-screening process used in this case effectively denied him his constitutional right to be present at all material portions of his trial. *See Snyder v. Com. of Massachusetts,* 291 U.S. 97, 54 S.Ct. 330, 78 L.Ed. 674 (1934). In *Snyder,* the Court held that "in a prosecution for a felony the defendant has the privilege under the Fourteenth Amendment to be present in his own person whenever his presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge." *Id.* 291 U.S. at 105. The Court further noted that the "defense may be made easier if the accused is permitted to be present at the examination of jurors." *Id.*

Petitioner admits, however, that the pre-screening procedure used in this case was not the functional equivalent of traditional voir dire (*See* Appellant's Br. at 118) ("In light of the publicity, the trial court undertook a lengthy *pre-screening* of prospective jurors prior to the formal *voir dire* in an effort to determine the impact of the press coverage and to secure a fair and impartial jury.") (first emphasis added).

The Court agrees with respondent and holds that the pre-screening was used to eliminate venire persons who were unfit to serve on the jury because of their reaction to the nature of the case and the press coverage it had received. Moreover, prospective jurors were removed either for cause or on consent and the court did not require either side to exercise any peremptory challenge during this procedure. Thus, petitioner's reliance on *Snyder* is not well-grounded. *See Snyder,* 291 U.S. at 107 ("Nowhere in the decisions of this Court is there a dictum, and still less a ruling, that the Fourteenth Amendment assures the privilege of presence when presence would be useless or the benefit but a shadow.")

Accordingly, petitioner's absence did not violate his constitutional right to be present at all *material* portions of the trial.

### B. *The Exclusion of Two African–Americans*

The prosecution exercised two of its peremptory challenges to exclude two African–Americans from the jury. Petitioner's counsel attempted to object to the alleged discriminatory nature of the prosecution's challenge but the trial judge did not entertain petitioner's objection because petitioner "obviously is not black." Thus, the judge did not require the prosecution to provide race-

neutral explanations for excusing the two jurors. (Tr. at 1453.)

■ Petitioner correctly argues that under *Powers v. Ohio*, 499 U.S. 400, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991), a *Batson* claim is not barred simply because the defendant's race differs from that of the excluded juror. *Id.* 111 S.Ct. at 1370. Petitioner's case was tried one year before the *Powers* decision. *Powers* is applicable to the instant case, however, because petitioner's direct appeal was *sub judice* on direct appeal at the time of the *Powers* decision. *See Griffith v. Kentucky*, 479 U.S. 314, 328, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987) (holding that failure to apply newly declared constitutional rule for the "conduct of criminal prosecution is to be applied retroactively to all cases, state or federal, pending on direct review or not yet final, with no exception for cases in which the new rules constitutes a 'clear break' with the past").

■ Although *Powers* is applicable, and if this case were tried after the *Powers* decision, the trial court would demand a race-neutral explanation, petitioner is not entitled to a new hearing on this issue. When a reviewing court concludes that a trial judge would have had to rule differently under a new Supreme Court standard, it should not reverse automatically but should instead apply harmless-error analysis. On collateral review of a State court conviction, an error of constitutional magnitude is to be considered harmless unless it had a " 'substantial and injurious effect or influence in determining the jury's verdict.' " *Brecht v. Abrahamson*, 507 U.S. 619, 638, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)).

■ In adopting the lower standard for collateral review, the *Brecht* Court reasoned that considerations of comity, federalism, and finality required a lesser standard once the conviction survives direct review within the State court system. In the instant case, there is nothing in the nature of this crime which implies a discriminatory use of peremptory strikes. Both the victims and the petitioner are white. Moreover, based on the voluminous evidence before this Court, there was clearly no racial aspect to this case and no reason to assume an illegitimate reason for peremptory challenges. Accordingly, the trial judge's failure to entertain petitioner's objection does not warrant a new hearing because it did not result in a substantial and injurious effect or influence in determining the jury's verdict.

### III. *BRADY INFORMATION*

■ It is well-established that non-disclosure by the prosecution of any evidence that might be favorable to a petitioner violates due process only if such evidence is material to the petitioner's guilt or punishment. *Brady v. Maryland*, 373 U.S. 83, 85, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Under *Brady*, the prosecution's suppression of evidence favorable to the accused violates due process if the evidence is material to guilt or punishment, irrespective of the Government's intentions. *Id.* The Supreme Court has held, however, that evidence is deemed material only if there is a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceedings would have been different." *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985). In *Bagley*, the Court adopted the *Strickland* definition of reasonable probability. *See Strickland v. Washington*, 466 U.S. 668, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The *Strickland* court defined reasonable probability as a "probability sufficient to undermine confidence in the outcome." *Id. Cf. Morris v. Mathews*, 475 U.S. 237, 247, 106 S.Ct. 1032, 89 L.Ed.2d 187 (1986) (adopting the *Strickland* definition in context of double jeopardy). Therefore, to warrant federal habeas relief, petitioner must demonstrate that the trial court would have decided this matter more favorably on his behalf had the evidence not been withheld.

■ In the instant case, petitioner asserts that Detective McCready "was aware that Jerry Steuerman had previously resorted to violence to settle a business dispute." (Pet's Mem. at 121.) Petitioner further asserts that McCready's knowledge of these events was not relayed by the prosecution to the defense before or during the petitioner's

trial and that this information would have been critical to the defense because the defense's theory of the case was that Steuerman was responsible for the murders. (*Id.* at 122.)

There are several problems with defendant's theory. The trial court found that this information was relevant only to impeach Steuerman's credibility, and that it would constitute *Brady* material only if Steuerman was a key government witness. By Memorandum Decision dated October 28, 1992, the trial court held that "Steuerman's testimony was 'minimally at best' related to proving that the defendant committed the murders of his parents, [and] was not a key witness. Therefore, the evidence relating solely to his credibility was not Brady material." (Memorandum Decision, 1992 at 9.) After reviewing the voluminous papers before this Court, there is clearly no reasonable probability that the result of the trial would have been different had the prosecution disclosed the above information. Accordingly, the information concerning Mr. Steuerman was not Brady material and the government's failure to disclose said material correspondingly did not constitute constitutional error.

## IV. *THE PROSECUTOR'S SUMMATION*

Petitioner's final argument is that "the prosecution went beyond the lawful bounds ... and asked the jury to speculate about facts that had never even been brought into the court room." (Pet's. Mem. at 132.) Specifically, the prosecutor asked the jury: "Where was the defendant's sister and brother-in-law from Port Jefferson, Shari and Ron Rother? ... Where were these folks who had regular contact with the Tankleffs and with the defendant? ... Maybe all was not so well in the paradise the defendant would have you believe was his home." (Tr. at 4894.)

█ Federal courts reviewing habeas claims based on prosecutorial misstatements during summation must distinguish between ordinary prosecutorial error and the type of egregious misconduct which amounts to a denial of constitutional due process. *Donnelly v. DeChristoforo*, 416 U.S. 637, 647–48, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974). To be

entitled to relief for the prosecutor's statements, petitioner must show that the comments had a "substantial and injurious effect or influence on the jury's verdict." *Bentley v. Scully*, 41 F.3d 818, 824 (2d Cir.1994); *see also United States v. Jaswal*, 47 F.3d 539, 544 (2d Cir.1995) (prosecutor's characterization of defendant's case as a "fairy tale" did not constitute misconduct).

█ The Court assumes without deciding that the prosecutor's remarks in his summation amounted to misconduct. Even if a prosecutor's argument is egregiously improper, a federal court cannot issue a writ of habeas corpus to State authorities unless the prosecutor's comments " 'so infect the trial with unfairness as to make the resultant conviction a denial of due process.' " *Darden v. Wainwright*, 477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431, (1974)).

In determining whether this standard has been met, the Court must consider: "(1) the severity of the prosecutor's conduct; (2) what steps, if any, the trial court may have taken to remedy any prejudice; and (3) whether conviction was certain absent the prejudicial conduct." *Bentley*, 41 F.3d at 824.

█ In the instant case, the prosecution's summation, while not exemplary, was not so severe as to deprive petitioner of a fair trial. Second, the trial court instructed the jury to consider only the evidence presented at trial and not opening statements or closing arguments. Third, there was compelling evidence, properly admitted, at trial to convict petitioner. Accordingly, petitioner has failed to demonstrate that the prosecutor's summation had a substantial or injurious effect or influence on the jury's verdict.

### CONCLUSION

For the foregoing reasons, petitioner's application for a writ of habeas corpus must be, and is hereby, DENIED.

SO ORDERED.