[848 NYS2d 286]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v MARTIN TANKLEFF, Appellant.

Second Department, December 18, 2007

## APPEARANCES OF COUNSEL

*Baker Botts LLP,* Washington, D.C. (*Stephen L. Braga, Court-ney G. Saleski* and *Sheila Kadagathur* of counsel); *Wilmer Cutler Pickering Hale & Dorr LLP*, Washington, D.C. (*Jennifer M. O'Connor* and *Brent Gurney* of counsel); *Kelley, Drye & Warren, LLP,* Washington, D.C. (*Barry J. Pollack* and *Dawn E. Murphy-Johnson* of counsel); *Law Offices of Bruce A. Barket, P.C.,* Garden City; *Clifford Chance US LLP,* New York City (*Warren Feldman* and *Scott J. Splittgerber* of counsel); and *Paul, Weiss, Rifkind, Wharton & Garrison LLP,* New York City (*Mark F. Pomerantz* of counsel), for appellant (one brief filed).

*Thomas J. Spota, District Attorney,* Riverhead (*Leonard Lato* of counsel), for respondent.

*Marc Howard,* Washington, D.C., amicus curiae pro se and for Adam Allen and others, amici curiae.

*Kate Germond,* Princeton, New Jersey, for Centurion Ministries, amicus curiae.

*Barry C. Scheck* and *Olga Akselrod,* New York City (*Keith Findley* on the brief), for The Innocence Project, Inc. and another, amici curiae.

*Donald M. Thompson,* Rochester, for New York State Association of Criminal Defense Lawyers and others, amici curiae.

*Alison R. Flaum,* Chicago, Illinois, for Peter Reilly and others, amici curiae.

*Mayer, Brown, Rowe & Maw LLP,* New York City (*Andrew H. Schapiro* and *Timothy C. Lambert* of counsel), for former New York prosecutors Michael Armstrong and others, amici curiae.

## OPINION OF THE COURT

RIVERA, J.P.

On the instant appeal, the primary issue presented is whether the County Court erroneously denied, after a hearing, the defendant's motion pursuant to CPL 440.10 (1) (g) and (h) to vacate two judgments of the same court, both rendered October 23, 1990, convicting him of murder in the second degree (two counts; one count as to each indictment), upon jury verdicts. For the reasons that follow, we grant that branch of the defendant's motion pursuant to CPL 440.10 (1) (g) which was to vacate the judgments based upon newly-discovered evidence, vacate the judgments and the sentences imposed thereon, and remit the matter to the County Court, Suffolk County, for a new trial.

### I. Factual and Procedural Background

#### A. Trial and Initial Appellate Proceedings

On September 7, 1988, Seymour Tankleff and Arlene Tankleff (hereinafter the victims or the Tankleffs) were fatally attacked in their home in Belle Terre, New York. Upon the arrival of the police at the crime scene, the defendant, the victims' son—who was then 17 years of age—repeatedly and consistently asserted that Seymour Tankleff's business partner, Jerard Steuerman (hereinafter Jerry Steuerman), committed the murders. The defendant was taken to the headquarters of the Suffolk County Police Department in Yaphank, where he was questioned extensively. James McCready, one of the lead detectives in the investigation and interrogation, utilized a ruse wherein he falsely advised the defendant that his father was alive and had accused the defendant of the crimes. During the questioning, the defendant asked, "[c]ould I have blacked out and done it?" and "[c]ould I be possessed?" At that point, a second detective, Norman Rein, responded, "Marty, I think that's what happened to you." The defendant then confessed to both killings and almost immediately thereafter recanted.

At the ensuing, highly-contested jury trial, the prosecution's evidence consisted primarily of this repudiated confession. The defense's theory at trial was that Jerry Steuerman, not the defendant, killed the Tankleffs. Jerry Steuerman had been pres-

ent at a card game at the Tankleffs' residence which lasted until approximately 3:00 A.M. on the morning of September 7, 1988. Furthermore, evidence was elicited at the trial that Jerry Steuerman owed Seymour Tankleff a substantial amount of money and that, one week after the Tankleff murders, he staged his own death, changed his appearance, and suddenly fled to California. Moreover, at trial, Detective McCready denied that he knew Jerry Steuerman prior to this case, testimony that would become a point of contention over the ensuing years.

After seven days of deliberations by the jury between June 21, 1990, and June 28, 1990, the defendant was convicted of murder in the second degree (intentional murder) with regard to Seymour Tankleff and murder in the second degree (depraved indifference murder) with regard to Arlene Tankleff. On October 23, 1990, he was sentenced to two consecutive terms of incarceration of 25 years to life. The defendant remains incarcerated to date, having served more than 17 years in prison.

The defendant appealed from the judgments of conviction. On his direct appeal, he argued, inter alia, that the police subjected him to custodial interrogation in violation of *Miranda v Arizona* (384 US 436 [1966]), and that his confession should have been suppressed because it was the product of a police-orchestrated ruse. In a sharply divided 3-to-2 decision and order, this Court affirmed the judgments of conviction (*see People v Tankleff*, 199 AD2d 550 [1993]). The Court of Appeals affirmed this Court's decision and order (*see People v Tankleff*, 84 NY2d 992 [1994]).

On February 7, 1996, the defendant filed a petition for a writ of habeas corpus pursuant to 28 USC § 2254 in the United States District Court for the Eastern District of New York. On January 29, 1997, the United States District Court for the Eastern District of New York (Platt, J.) denied the defendant's petition (*see Tankleff v Senkowski*, 993 F Supp 151 [1997]). On February 28, 1997, Judge Platt granted the defendant a certificate of appealability (*see Tankleff v Senkowski*, 993 F Supp 159 [1997]).

In an order dated January 12, 1998, the United States Court of Appeals for the Second Circuit (hereinafter the Second Circuit) found, inter alia, that the defendant had been in custody, and was thus entitled to *Miranda* warnings, prior to the time when he was finally advised of his rights (*see Tankleff v Senkowski*, 135 F3d 235 [1998]). Accordingly, the Second Circuit found that the County Court should have suppressed

the defendant's inculpatory, pre-*Miranda* statements. However, since the Second Circuit characterized those statements as "brief and substantially the same as some of his later, admissible confession," that court ruled that this error was harmless beyond a reasonable doubt (*id.* at 245). Relying upon the United States Supreme Court's holding in *Oregon v Elstad* (470 US 298 [1985]), the Second Circuit wrote that "it does not follow that the[ ] later statements must be suppressed as 'fruit' of the original *Miranda* violation" (135 F3d at 244).

Notably, the Second Circuit acknowledged that the New York Court of Appeals has declined to follow the rule of *Oregon v Elstad,* adding, "it is not for us to say whether [the defendant] might or might not have any claim based on state constitutional law as a result of our holding that [the defendant] was, under *Miranda* and its federal progeny, in custody at the time of his 'first' confession" (*id.* at 246).

Subsequently, the defendant's petition for rehearing in the Second Circuit, as well as his motions for reargument in this Court and the Court of Appeals, were denied (*see People v Tankleff,* 93 NY2d 1034 [1999]).

## B. The October 2003 CPL 440.10 Motion in the County Court

On October 3, 2003, the defendant moved in the County Court, Suffolk County, to vacate the judgments of conviction pursuant to CPL 440.10 (1) (g) and (h), on the grounds of newly-discovered evidence and actual innocence. The defendant also argued that the Second Circuit's decision "materially altered the law" on the issue of whether he was in "custody" at the time of his initial confession. He urged the County Court to reexamine the "custody issue" in light of the Second Circuit's decision. Moreover, he asserted that he had received ineffective assistance of counsel.

In support of his motion, the defendant proffered, inter alia, the affidavits of Karlene Kovacs, sworn to August 10, 1994, and Glenn Harris, sworn to August 29, 2003. These affidavits constitute the first component of his claim of "newly-discovered evidence."

### 1. Affidavit of Karlene Kovacs

In her affidavit, Kovacs averred that, after the Tankleff murders, she and her friend John Guarascio went to the house of John Guarascio's sister, where they "smoked a joint" of marijuana. Kovacs asserted that, while there, "Joe [referring to one Joseph Creedon]," admitted that he was "involved in the

Tankleff murders in some way." Kovacs recalled Creedon saying "something about hiding behind trees and bushes at the Tankleff house during the time of the murders" and that he was with someone named "Steuerman." As Kovacs explained it in her affidavit, Creedon described to Kovacs how, after the murders, "they [sic] had to make a quick dash to avoid being caught."

## 2. Affidavit of Glenn Harris

In February 2002 Glenn Harris was contacted by representatives of the defense. Thereafter, he corresponded with, among others, both the defendant and the defendant's retained investigator, Jay Salpeter. In one letter to Salpeter, Harris wrote: "What took you so long and who put you on to me? At this point, that *is* not important what is important is that Mr. Tankleff be released as soon as *we* can prove it. He has suffered enough!" Essentially, in the correspondence, Harris contended that he drove Creedon and another individual, Peter Kent, to the Tankleffs' residence on the night of the murder.

In a letter dated July 8, 2002, and delivered to Salpeter, Harris wrote: "I lied, fabricated, concocted the whole . . . story."

Subsequently, however, Harris provided Salpeter with an affidavit, sworn to August 29, 2003, wherein he related in great detail how he drove Creedon and Kent to the Tankleff residence on the night of the murders. In that affidavit, Harris specifically averred that, in early September 1988, he ran into Kent and Creedon. He stated that, after smoking crack, he drove Creedon and Kent to a house in Belle Terre because Creedon knew that there was a "safe" at that house. Harris asserted that he parked his car on the street near that house. He averred that Creedon and Kent exited the car and walked towards the Tankleff house. According to Harris, approximately 10 to 30 minutes later, Creedon and Kent came running back to the car. Harris asserted that Creedon had gloves in the left-hand pocket of his windbreaker, and told him "lets [sic] go." According to Harris, Creedon and Kent were "both" nervous and Kent was "winded."

In his affidavit, Harris stated that he thereafter drove Kent to Kent's mother's house. Harris asserted that, once there, he observed Kent burning his clothing. At this point, Harris "realized that something more than a burglary occurred." He averred that he later heard on the radio that "something happened to an elderly couple" in Belle Terre. Harris explained that he was "on parole" at that time and was "afraid to go to the police."

## C. The District Attorney's Investigative Report

An investigation was conducted by the Suffolk County District Attorney in 2003 regarding the defendant's claim that "new evidentiary materials" established his "actual innocence." In a report authored by the Assistant District Attorney in charge of the investigation, Leonard Lato, dated December 17, 2003, Lato concluded that the defendant was not entitled to a new trial or a hearing because the evidence that he presented was not "newly discovered" and did not establish his "actual innocence." Lato found Harris to be incredible and stated that Harris "may be suffering from a mental disease or defect that renders him incapable of differentiating between reality and fantasy."

## D. The CPL 440.10 Hearing

On May 12, 2004, the People consented to a CPL 440.10 hearing, on the condition that Harris not be granted transactional immunity. The hearing commenced on July 19, 2004. At the hearing, the defendant's case consisted of a total of 23 witnesses. The People presented 16 witnesses. Several of the witnesses who testified admitted that they had criminal histories and/or had abused drugs. By way of general background, brief portions of the testimony elicited at the hearing are described herein.

### 1. The Defendant's Case

#### a. Salpeter's Investigation

In June 2001, Jay Salpeter, a former detective who had retired from the New York City Police Department, and who was at the time a self-employed private investigator, was retained by the defense. In the course of his investigation, Salpeter reviewed the files of the defendant's prior counsel. He came across certain reports relating to Kovacs and learned that, in 1994, Kovacs had provided the defense with an affidavit implicating Creedon. Prior counsel's files also included a police report indicating that Harris and Creedon were accomplices in the burglary of a bagel store owned by Jerry Steuerman. In January 2002, Salpeter contacted Harris, who, at that time, was an inmate at the Clinton Correctional Facility in Dannemora, New York.

In March 2002, Salpeter personally interviewed Harris. Salpeter testified at the hearing that, during this interview, in substance, Harris told him that Creedon and Kent committed the Tankleff murders.

On March 21, 2004, upon Harris's release from the correctional facility, Harris and Salpeter traveled together to Belle Terre. Salpeter testified that, during that visit, Harris was able to "pick out the [Tankleff] house" and showed him where he stopped the car, where Creedon exited the car, and where Creedon disposed of a "pipe." Thereafter, Salpeter returned to this location and found a rusted, "weathered" 36-inch-long cylindrical metal pipe.

In the course of his testimony, Salpeter observed that although Kovacs had no connection with Harris, both had independently named Creedon as the killer.

John Trager, who had lived for 32 years at the property in Belle Terre where the pipe was recovered, described the area where the pipe was found as "heavily wooded" and "[n]ever touched." Trager testified that, in "all the years" he had resided at this location, he did not recall seeing the pipe and did not know how or when the pipe was placed there. He stated that he did not place or deposit the pipe at this location.

### b. Creedon's Criminal Activity

Creedon testified at the CPL article 440 hearing pursuant to a subpoena and while represented by counsel. In the course of his testimony, Creedon admitted that, from 1986 to 1991, he generated "some" of his income "through criminal activities." In this regard, Creedon "collected money" for Todd Steuerman, Jerry's Steuerman's son, who was a known drug dealer. Creedon also allegedly extorted money from other drug dealers.

According to Creedon, Todd Steuerman conducted his "drug business" from the Strathmore Bagels store on Nesconset Highway in Stony Brook, a store owned by Jerry Steuerman. Creedon stated that he knew that there were "large sums of cash" in the bagel shop. Creedon testified that, in December 1988, he and Harris tried to "break into the safe" in the Strathmore Bagels store. However, Creedon and Harris were unsuccessful. Instead, they stole a Strathmore Bagels truck and "rammed it through a wall at a Fayva shoe store" in order to steal the safe maintained at the shoe store.

Creedon testified that, in April 1989, Todd Steuerman asked him to collect a $60,000 drug debt for him. According to Creedon, Todd Steuerman also stated during this conversation that his father, Jerry Steuerman, wanted to "cut[ ] out" the defendant's tongue. Creedon averred that Todd Steuerman suggested to him that he speak with Jerry Steuerman regarding

"cutting out" the defendant's tongue. Additionally, Creedon asserted that Todd Steuerman wanted to hire him to "whack" or murder someone for the sum of $10,000. Creedon allegedly "blew [this offer] off."

Creedon admitted that he had an extensive criminal history, including assault, rape, and attempted grand larceny. He also admitted that, in the past, he had lied to the police and other law enforcement authorities.

### c. Creedon's Violent Propensities

Creedon testified that, in the course of his drug debt "collection" activities, he sometimes resorted to the use of physical violence. One witness acquainted with Creedon testified that Creedon did "whatever he had to do" if someone was not willing or able to pay money owed to Creedon, including "[b]eat him up, shoot him." More than one witness testified at the hearing that Creedon's nickname was "Joey Guns."

Several witnesses described Creedon's violent propensities. For instance, Teresa Covias, who lived with Creedon from 1986 to 1994, and bore him a son and daughter, testified that Creedon stated that he would "torture" individuals, including lighting their faces or hands on fire with gasoline. John Guarascio, Covias's brother, testified that Creedon "terrorized" his family and abused Covias.

### d. Creedon and Jerry Steuerman's Alleged Involvement in the Tankleff Murders

Although Jerry Steuerman testified at the defendant's trial, he did not testify at the CPL article 440 hearing.

Creedon, however, testified at the CPL article 440 hearing that he never met Jerry Steuerman or spoke with him. Further, Creedon denied ever admitting to others that he was involved in the Tankleff murders. According to Creedon, he never killed anyone. In addition, he claimed that he had never been to Belle Terre.

In contrast to Creedon's testimony, the following witnesses implicated Creedon and/or Jerry Steuerman in the Tankleff murders:

### i. Karlene Kovacs and John Guarascio

In the 1990s, Karlene Kovacs dated John Guarascio. On one occasion during that period, John Guarascio invited Kovacs to the home of Creedon and Covias for Easter dinner. At some

point during that evening, Creedon suggested that Kovacs and John Guarascio join him in smoking a "joint" of marijuana. While these three were smoking, Creedon stated that he had been "at the Tankleff house with a Steuerman," that his adrenaline was "flowing," that "they [sic] had to get rid of their clothes," and that "they [sic]" were leaving for the Carolinas because "they [sic] had to move out of town."

Kovacs testified that she was "absolutely 100 percent certain" that Creedon told her that he was "there when the Tankleffs were murdered." She stated that she did not have "any doubt at all" regarding Creedon's statements to her that he was hiding in the bushes outside of the Tankleff home and that "a Steuerman" was present at the time of the murders.

John Guarascio testified that, during his Easter visit to Creedon's home, he, Kovacs, Creedon, and one of Creedon's friends smoked a marijuana "joint." John Guarascio recalled that Kovacs and Creedon engaged in a conversation, wherein Creedon "was talking about being in some bushes." According to John Guarascio, Creedon also mentioned that he was "watching a card game" and was "pumped up" at that time. John Guarascio had "no idea" that Creedon was referring to the Tankleff case and thought that it was "another one of his robberies and drug deals."

According to their testimony at the hearing, Kovacs and John Guarascio had not spoken to each other since the two of them stopped dating in 1991.

### ii. Joseph Guarascio

Joseph Guarascio (hereinafter Joseph) is the son of Creedon and Covias, and was 17 years old at the time of the hearing. Joseph testified that he lived with Creedon until he was six years old, at which time he moved with his mother, sister, and stepfather out of New York.

Joseph testified that, during a visit with Creedon, he asked, "Dad, did you really do [the Tankleff murders]?" According to Joseph, the "seriousness" with which Creedon responded "[y]es, I did it," was "scary."

Joseph then relayed the following details as allegedly told to him by Creedon: Todd Steuerman and Jerry Steuerman had been waiting outside of the Tankleff home and signaled Creedon. Creedon and Kent entered the house through a window, while Harris remained outside. Creedon choked Seymour Tankleff with a bicycle brake-line stripped of the plastic and hit him on

the head with a .38 special handgun. Kent stabbed Arlene Tankleff. While inside the Tankleff home, Creedon and Kent looked into the defendant's room and saw him sleeping.

As Joseph recounted to the hearing court, Creedon and Kent left the Tankleff home, but Creedon returned through the back door to retrieve a piece of metal pipe. As Harris drove them away, Harris threw the pipe out of the car window. Harris, Creedon, and Kent then went to their friend's house, where Creedon and Kent burned their own clothing in the basement.

According to Joseph, Creedon told him that he is still in touch with Jerry Steuerman. Further, Joseph testified that Creedon stated to him that "he [Creedon] paid a hundred thousand dollars [to Detective James McCready] to keep his [Creedon's] name out of it."

### iii. Gaetano Foti

Gaetano Foti testified that he and Creedon discussed the Tankleff murders. Foti told Creedon that he thought that the defendant was innocent. According to Foti, Creedon responded, "he is innocent because I did it."

### iv. Joseph Graydon

Joseph Graydon, one of Creedon's associates in selling drugs and robbing drug dealers, testified that in either July or early August 1988, Creedon told him that he was offered the sum of $25,000 from a partner in Strathmore Bagels to kill the other partner because one partner owed money to the other partner. According to Graydon, Creedon told him that the partner who was going to be killed would be at the bagel store on a Sunday and that it had to look like a robbery. Graydon stated that Creedon agreed to split the $25,000, plus the proceeds of the robbery, with him.

Graydon further testified that he went with Creedon, who was carrying a gun, to Strathmore Bagels on a Sunday but that it was closed.

### v. William Ram

William Ram testified that, on the night before the Tankleff murders, Creedon told him that he was working for someone in the bagel business and that Creedon wanted to pay Ram to "rough up" or "straighten out" the partner or business associate of the person who had hired Creedon. According to Ram, Creedon told him that the victim lived in an upscale neighbor-

hood, Belle Terre, and was a "Jew in the bagel business." Ram testified that he declined to participate in the planned attack because he did not believe in bothering "innocent" people.

Ram testified that Creedon asked to borrow his car because Harris's car was old and would "stick out" in the upscale Belle Terre neighborhood where the prospective victim resided. Ram denied Creedon his permission to use the car.

Ram stated that, on the day after his discussion with Creedon, Harris came to Ram's home and told him that he thought "they" did something bad and were "going to be in trouble." Ram quoted Harris as saying, "[t]hey came running out of the house. They had blood on them. Peter [Kent] was white as a ghost. Something bad happened. They drove away. And after that, they went and burned their clothes."

As Ram recounted it, later that day, he saw reports of the Tankleff murders on the news and "put two and two together." He believed that Creedon, Kent, and Harris had gone to Belle Terre and killed the Tankleffs.

### vi. Bruce Demps

Bruce Demps met Todd Steuerman in the late 1980s and again in or around 1991 or 1992. Demps testified that Todd Steuerman told him that Jerry Steuerman had a "beef" with the Tankleff family and hired some guys to take care of business, more particularly, to "put a hit on them." As Demps recalled it at the hearing, Todd Steuerman also told him that, although the defendant was convicted of the murders, he did not commit them "[b]ecause [Todd's] father sent someone to do it." Demps recounted Todd Steuerman's statement to him that the problem that Jerry Steuerman had with the Tankleffs was that he owed "them money" and "couldn't pay" them.

### vii. Neil Fischer

In the spring of 1989, Neil Fischer, a cabinet maker, was doing work for Jerry Steuerman in one of the bagel stores. As Fischer recalled it, he was installing shelves underneath the counters, when he overheard Jerry Steuerman arguing with a man and telling the man "he had already killed two people and that it wouldn't matter to [Jerry Steuerman] if he killed him." Fischer "assumed" that Jerry Steuerman was speaking about the Tankleffs. He stated that he "knew the whole story from the media."

### e. Harris's Involvement in the Crimes

As set forth above, Harris provided an affidavit placing Creedon, Kent, and himself at the Tankleff residence on the night of the murders. However, when called to testify at the CPL article 440 hearing, Harris asserted his right against self-incrimination, secured to him by the Fifth Amendment to the United States Constitution, and thus refused to testify.

The defense, however, presented the testimony of Father Ronald Lemmert, the Catholic chaplain at Sing Sing Correctional Facility in Ossining, New York, who provided Harris with individual counseling services while Harris was incarcerated there on offenses unrelated to the Tankleff murders. Harris authorized Father Lemmert to disclose their conversations.

As described by Father Lemmert, during one of these conversations, Harris told Father Lemmert that he had been with two men who told him to drive late at night to a "very wealthy looking house" on Long Island, presumably to rob it to get money for drugs. According to Father Lemmert, Harris stated that he drove there, but stayed in the car as the other two men entered the targeted house. Father Lemmert averred that Harris revealed to him that the two other men returned to the car some time later in a "visibly agitated" state, and with blood on them. As recounted by Father Lemmert, Harris told him that, on the day after this occurred, he realized that they had been at the Tankleff home, but feared telling the police because he was on parole. Father Lemmert asserted that Harris feared "for his own life and the safety of his children." Further, Harris feared that he would be held responsible for the murders.

Father Lemmert stated that Harris told him that he was not going to testify at the hearing because other inmates threatened his children. Harris also told Father Lemmert that an investigator from the Suffolk County District Attorney's office told him that he would spend the rest of his life in prison because of his involvement in the crime "if this were to ever be revealed."

Father Lemmert admitted that Harris had a "long psychiatric history."

### f. The Alleged Relationship Between Jerry Steuerman and Detective James McCready

Leonard Lubrano testified, at the hearing, that in the late 1970s and early 1980s, he had owned a wholesale baking business and had purchased products from Jerry Steuerman for use

in that business. Lubrano then became familiar with Detective James McCready in the mid-1980s, when McCready frequented a restaurant operated by Lubrano.

To the best of his recollection, Lubrano stated that, during that period, McCready told him that he was doing a project for Strathmore Bagels. Lubrano averred that he had no doubt that he had seen McCready previously in the Strathmore Bagels shop in Stony Brook. Lubrano also testified that he saw McCready in the bagel shop prior to 1988.

### g. Creedon was Not a Suspect at the Defendant's Trial

Attorney Robert Gottlieb represented the defendant at the trial. At the CPL article 440 hearing, Gottlieb admitted that he did not call Creedon as a witness at the trial. Gottlieb explained that he did not view Creedon as a suspect during the defendant's trial because "the heart" of the defense was that Jerry Steuerman was involved in the murders. Moreover, Gottlieb stated that in April and September of 1990, he did not have any information that Creedon had admitted to others that he had murdered the Tankleffs, or that Harris drove Creedon to the Tankleff residence. Gottlieb asserted that, had he possessed this information at the time of trial, Creedon would have become a suspect and that, in Gottlieb's opinion, these facts would have made a difference to the jury at the trial.

### h. Seymour Tankleff's Business Problems with Jerry Steuerman

Paul Lerner, who testified that he socialized with the Tankleffs quite often, recalled that, in the spring or summer of 1988, Seymour Tankleff told him that Jerry Steuerman owed him a lot of money and was not making payments on the debt. Lerner stated that, several weeks after learning of the debt, Seymour Tankleff told him that he was going to call in Jerry Steuerman's debt and probably foreclose "on the bagel stores and put [Jerry Steuerman] out of business."

Ron Falbee, the defendant's maternal cousin, testified that he was the executor of the Tankleffs' estates, and was the defendant's legal guardian as well. According to Falbee, Arlene Tankleff explained to him that the Tankleffs were having a great deal of trouble with Jerry Steuerman, and that she was getting frightened of the relationship between Jerry Steuerman and the Tankleffs. Falbee further testified that Seymour Tankleff also told him that the partnership with Jerry Steuerman was ending.

Falbee stated that, after the murders, he found an unsigned letter on the desk of Seymour Tankleff, dated June 29, 1988, and addressed to Jerry Steuerman, demanding payment in the sum of $50,000 on a 1986 note that Jerry Steuerman had executed in favor of the Tankleffs. Falbee admitted that Jerry Steuerman's debt was not forgiven after the Tankleffs' deaths, but that the Tankleffs' estates reached a settlement with Jerry Steuerman. Falbee acknowledged that the defendant was the primary beneficiary under the Tankleffs' wills.

## 2. The People's Case

### a. Peter Kent

At the hearing, Peter Kent admitted that he had committed crimes with Harris and Ram, but denied doing the same with Creedon. He also denied any involvement in the Tankleff murders. According to Kent, Harris implicated Kent in the Tankleff murders to "get back" at him because, in 2000, Kent had a sexual relationship with Harris's wife.

Kent stated that Ram contacted him the day before he testified. According to Kent, Ram told him that Ram was getting paid the sum of $10,000 for his statements to help the defendant and that Salpeter set up an account for Kent to receive the sum of $50,000.

### b. Thomas McDermott

Thomas McDermott, a retired detective investigator for the Suffolk County District Attorney's office, testified that no one named in the affidavit sworn to by Kovacs confirmed her version of events.

McDermott further testified that he interviewed Creedon on January 4, 1995. According to McDermott, during this interview, Creedon told him that Todd Steuerman wanted him to cut out the defendant's tongue and that Jerry Steuerman would pay a lot of money if Creedon did so.

### c. Robert Trotta

Suffolk County Police Detective Robert Trotta testified that, on October 14, 2003, Gaetano Foti, one of his confidential informants, contacted him after reading about the Tankleff case in the newspaper. According to Trotta, Foti related, to him, the substance of a conversation between Foti and Creedon, in which Creedon allegedly claimed to have knowledge that the defen-

dant did not commit the murders because Creedon was himself at the Tankleff home on the night of the crimes. Trotta stated that Foti had cooperated with the District Attorney's office in the past and had provided it with information on drug cases in exchange for reduced sentences. Trotta agreed that he had described Foti to Assistant District Attorney Lato as a "reliable source."

### d. Walter Warkenthien

Walter Warkenthien, a retired homicide detective working for the Suffolk County District Attorney's office, was assigned to this case on September 30, 2003. Warkenthien interviewed Kovacs twice. According to Warkenthien, Kovacs told him during the first interview that she was outside smoking marijuana when Creedon arrived at the house she was visiting, but stated during the second interview that she was in a bedroom when Creedon arrived. Warkenthien asserted that Kovacs made no mention of blood during the first interview and only discussed it during the second interview after Warkenthien himself mentioned it.

Warkenthien also recounted his interview of Harris and Harris's statements regarding the murders. Warkenthien testified that Harris told him that, after Harris drove to the Tankleffs' neighborhood shortly before the murders, he parked the car near the bluffs, which Warkenthien measured as six tenths of a mile from the Tankleff house. According to Warkenthien, Harris stated that Kent and Creedon came back to the car less than 10 minutes after exiting it, and that between 5:00 A.M. and 6:00 A.M. on September 7, 1988, Harris first heard about the murders on the radio.

Warkenthien recounted how he told Harris that his statement was inconsistent with his prior sworn statements, and informed him that if the statement he gave to Salpeter were true, Harris could be "changing places" with the defendant.

Warkenthien testified that, on August 25, 2004, he went to the Trager's home to look at the real property where Salpeter found a metal pipe. Warkenthien stated that he found two rusty pipes that day and then returned two days later, at which time he found two additional pipes. According to Warkenthien, the pipes, which were discovered in plain view, fit the same size and description of the pipe recovered by Salpeter. Warkenthien testified that the pipes he recovered had the same diameter as the one discovered by Salpeter, but were much longer than that

pipe. Warkenthien explained that, of the pipes that he recovered, the one closest to the location at which Salpeter discovered the first pipe was 13 feet away from that location.

### 3. The Order Appealed From

In an order dated March 17, 2006, the County Court denied the defendant's motion in its entirety on the following grounds:

### a. Due Diligence

The County Court found that the defendant did not exercise due diligence in moving for a new trial.

### b. Hearsay

The County Court determined that statements purportedly made by Creedon to "nefarious scoundrels," many with "extensive criminal histories that included illegal drug use and sales, burglary, robbery, assault and other similar crimes," were hearsay and not admissible as declarations against penal interest (2006 NY Slip Op 30332[U], *4).

The court also found that the witnesses who testified about Creedon's confession were shown to be "unreliable, incredible, contradictory, and possibly motivated to harm Creedon by having him convicted of these murders" (id. at *6). For example, the court concluded that Creedon's statements to Kovacs would not be admissible at a new trial since she "lacks reliability and credibility" (id. at *7). Similarly, the court stated that Foti's testimony was "equivocal and not reliable" (id. at *9).

The court analyzed the admissibility of the affidavit sworn to by Harris. It held that "the affidavit provided by Harris would not be admissible at trial since it lacks trustworthiness and reliability, and even were he to testify at a new trial, it would appear [that] his testimony would lack any credibility" (id. at *10).

### c. The Pipe and McCready's Credibility

The County Court held that the pipe introduced by the defendant as the actual murder weapon had no probative value because there was no physical evidence connecting it to the murders, and because the People's investigator found other pipes in the same location.

The court also found that Leonard Lubrano's testimony relating to the alleged relationship between McCready and Steuerman would not be admissible at a new trial.

The court concluded "that the bulk of the evidence which the defendant seeks to have presented at a new trial would be inadmissible, and that what is left would be insufficient for a jury to render a different verdict" (*id*. at \*14).

### d. The Claim of Actual Innocence

The County Court rejected the defendant's claim of actual innocence.

### II. The Instant Appeal

On May 25, 2006, this Court (Rivera, J.), granted the defendant's application for a certificate granting leave to appeal from the order dated March 17, 2006, denying his motion pursuant to CPL 440.10 (1) (g) and (h) to vacate the two judgments convicting him of two counts of murder in the second degree.

### III. The Parties' Contentions

On appeal, the defendant contends that the County Court committed numerous errors of law and fact that warrant reversal. The defendant argues that the evidence proffered at the CPL article 440 hearing proves his actual innocence or, at a minimum, entitles him to a new trial.

The People counter that the County Court properly found that the defendant failed to establish that his motion was "made with due diligence after the discovery of such alleged new evidence" (CPL 440.10 [1] [g]). Further, they assert that the County Court properly rejected the defendant's evidence because it was inadmissible hearsay and incredible as a matter of law. Finally, the People contend that the defendant failed to prove his actual innocence.

### IV. Legal Analysis

It is abhorrent to our sense of justice and fair play to countenance the possibility that someone innocent of a crime may be incarcerated or otherwise punished for a crime which he or she did not commit. A motion pursuant to CPL 440.10 is a vehicle which "enables convicted defendants to fully vindicate their rights" (34 NY Jur 2d, Criminal Law § 3047, at 838).

"Prior to the enactment of [CPL 440.10] New York had no statute for collateral attack on a judgment of conviction" (Preiser, Practice Commentaries, McKinney's Cons Laws of NY, Book 11A, CPL 440.10, at 246). Motions to vacate a judgment, which are now codified in CPL 440.10, were "designed collec-

tively to embrace" nonappellate postjudgment motions and other remedies, namely (1) applications for a writ of error coram nobis; (2) motions for a new trial on the ground of newly-discovered evidence; (3) state petitions for a writ of habeas corpus; and (4) federal petitions for a writ of habeas corpus (Staff Comment of Temp St Commn on Rev of Penal Law and Crim Code, 1967 Proposed NY CPL art 225 [now art 440], at 289-290; *see People v Crimmins,* 38 NY2d 407, 413-414 [1975]).

## A. CPL 440.10 (1) (g)

CPL 440.10 (1) (g) provides as follows:

> "1. At any time after the entry of a judgment, the court in which it was entered may, upon motion of the defendant, vacate such judgment upon the ground that: . . .

> "(g) New evidence has been discovered since the entry of a judgment based upon a verdict of guilty after trial, which could not have been produced by the defendant at the trial even with due diligence on his part and which is of such character as to create a probability that had such evidence been received at the trial the verdict would have been more favorable to the defendant; provided that a motion based upon such ground must be made with due diligence after the discovery of such alleged new evidence."

CPL 440.10 (1) (g), which permits vacatur of a judgment of conviction based upon newly-discovered evidence, "is the successor to subdivision 7 of section 465 of the former Code of Criminal Procedure, which provided for application for a new trial on similar, but somewhat more stringent, grounds" (*People v Crimmins,* 38 NY2d 407, 413 [1975]). As explained by the Court of Appeals in *People v Crimmins* (38 NY2d at 413), "[u]nlike a postconviction application for a new trial under the code, which had to be made within one year after judgment, no time limitation is prescribed for a motion to vacate judgment under CPL 440.10 (subd [1], par [g])."

The power to vacate a judgment of conviction upon the ground of newly-discovered evidence and concomitantly grant a new trial rests within the discretion of the hearing court (*see People v Salemi,* 309 NY 208, 215 [1955], *cert denied* 348 US 845 [1954]). While the Court of Appeals has no power in a noncapital case to review the exercise of such discretion (*see People v*

*Crimmins,* 38 NY2d at 415), this Court is not bound by the hearing court's factual determinations and may make its own credibility determinations (*see e.g. People v Wong,* 11 AD3d 724, 725-726 [2004]).

"Upon an appeal to an intermediate appellate court from a judgment, sentence or order of a criminal court, such intermediate appellate court may consider and determine any question of law or issue of fact involving error or defect in the criminal court proceedings which may have adversely affected the appellant" (CPL 470.15 [1]). In this regard, this Court has a "broad, comprehensive scope" of review (Preiser, Practice Commentaries, McKinney's Cons Laws of NY, Book 11A, CPL 470.15, at 529). Thus, this Court's jurisdiction is not limited to reviewing errors of law, but extends to the power to reverse or modify a judgment on the facts and as a matter of discretion in the interest of justice (*see* CPL 470.15 [3]; *People v Cona,* 49 NY2d 26, 33 [1979]; *People v Coppa,* 45 NY2d 244, 249 [1978]).

Where appropriate, this Court may "review the facts and substitute its discretion for that of nisi prius even in the absence of abuse" (*People v Rickert,* 58 NY2d 122, 133 [1983]).

### 1. Newly Discovered Evidence—The Six Criteria

" 'Newly-discovered evidence in order to be sufficient must fulfill all the following requirements: 1. It must be such as will probably change the result if a new trial is granted; 2. It must have been discovered since the trial; 3. It must be such as could have not been discovered before the trial by the exercise of due diligence; 4. It must be material to the issue; 5. It must not be cumulative to the former issue; and, 6. It must not be merely impeaching or contradicting the former evidence' " (*People v Salemi,* 309 NY 208, 215-216 [1955], *cert denied* 348 US 845 [1954], quoting *People v Priori,* 164 NY 459, 472 [1900]; *see People v Richards,* 266 AD2d 714, 715 [1999]; *People v Reyes,* 255 AD2d 261, 263 [1998]; *People v Taylor,* 246 AD2d 410, 411 [1998]; *People v Yoli,* 150 AD2d 741 [1989]; *People v Lavrick,* 146 AD2d 648 [1989], *cert denied* 493 US 1029 [1990]; *People v Rivera,* 119 AD2d 517, 518 [1986]; *People v Latella,* 112 AD2d 321, 322 [1985]; 34 NY Jur 2d, Criminal Law § 3063, at 862).

At a hearing on a motion pursuant to CPL 440.10 (1) (g), the

defendant has the burden of proving by a preponderance of the evidence every fact essential to support the motion (*see* CPL 440.30 [6]; *People v Tucker,* 40 AD3d 1213, 1214 [2007]).

## 2. Due Diligence Requirement

■ With regard to his motion to vacate the judgment of conviction on the basis of "newly-discovered evidence," the defendant was required to show that the motion was made "with due diligence after the discovery of [the] alleged new evidence" (*People v Boyette,* 201 AD2d 490, 491 [1994], quoting CPL 440.10 [1] [g]). The County Court found that the defendant failed to make this motion with due diligence. We disagree.

"[T]he due diligence requirement is measured against the defendant's available resources and the practicalities of the particular situation" (34 NY Jur 2d, Criminal Law § 3064, at 866; *see People v Hildenbrandt,* 125 AD2d 819, 821 [1986]). Under the unique facts of this case, the defendant should not be charged with a lack of due diligence in finding the multiple witnesses who implicated Creedon and/or Jerry Steuerman. The defendant's investigation resulted in a body of new evidence which required time to accumulate. He should not be penalized for waiting to amass all of the new evidence and then presenting it cumulatively to the County Court. Such conduct avoided separate motions upon the discovery of each witness, obviated the squandering of resources, and preserved judicial economy.

## 3. The Evaluation of the Evidence

■ A review of the record on appeal reveals that the County Court's determination amounted to a misapplication of its gatekeeper function relative to the evaluation and admissibility of the proffered "new evidence."

The resolution of the inquiry into whether the evidence adduced at the hearing "is of such character as to create a probability that had such evidence been received at the trial the verdict would have been more favorable to the defendant" (CPL 440.10 [1] [g]) is dispositive of a court's determination of a motion pursuant to CPL 440.10 (1) (g). In carrying out this task, the hearing court is obligated to conduct a critical analysis of the evidence. It cannot merely engage in the mechanical exclusion of such evidence.

The County Court completely disregarded a crucial fact which is pivotal to our determination. Namely, many of the witnesses who testified at the CPL article 440 hearing were *unrelated* to

each other, and their genesis as witnesses was separated by both space and time. For instance, there is absolutely no connection between Kovacs, Foti, Demps, Fischer, Joseph, and Ram. Notably, although clearly not connected to one another, each of those witnesses implicated Creedon and/or Jerry Steuerman in the Tankleff murders.

Moreover, a court must view and evaluate all of the evidence in its entirety. In its determination as to the "impact of evidence unavailable at trial, a court must make its final decision based on the likely cumulative effect of the new evidence had it been presented at trial" (*Amrine v Bowersox,* 128 F3d 1222, 1230 [1997], *cert denied* 523 US 1123 [1998]).

In this case, the County Court failed in this regard. Instead, it erroneously applied both a narrow approach and methodology in evaluating the evidence. It appears that the County Court never considered that the cumulative effect of the new evidence created a probability that, had such evidence been received at the trial, the verdict would have been more favorable to the defendant.

The County Court, in effect, applied a blanket disqualification of all of the defendant's proffered evidence. It viewed almost all of the defendant's witnesses as questionable, untrustworthy, or unreliable. It dismissed, outright, the possibility that witnesses with criminal records, drug addictions, and/or psychiatric issues may nevertheless be capable of testifying truthfully. A witness's "unsavory background[ ]" does not render his or her "testimony incredible as a matter of law" (*People v Smith,* 302 AD2d 615, 616 [2003]; *see People v Toro,* 272 AD2d 351 [2000]). As noted by my learned colleague, the Honorable Gabriel Krausman, at the oral argument before this Court, the People "use [such witnesses] all the time" (*see e.g. People v Brown,* 41 AD3d 261, 264 [2007], *lv denied* 9 NY3d 873 [2007]; *People v Smith,* 302 AD2d 615, 616 [2003]; *People v Louis,* 294 AD2d 377 [2002]).

Similarly, the County Court dismissed as incredible the testimony of certain witnesses on the ground that they were biased against Creedon. We cannot conclude that multiple witnesses who admittedly expressed fear of or contempt for Creedon perjured themselves in order to implicate Creedon in the murders.

On a related topic, we reject the People's assertion, made at the oral argument of the instant appeal, that certain witnesses came forth because this was a highly-publicized case. The claim that intense media coverage somehow played a role in this case

and the implication that this prompted individuals to testify falsely is sheer conjecture and speculation.

Additionally, the County Court disparaged the testimony of several witnesses on the ground that it would constitute inadmissible hearsay. "Implicit in th[e] ground for vacating a judgment of conviction is that the newly discovered evidence be admissible" (34 NY Jur 2d, Criminal Law § 3063, at 863; *see People v Boyette,* 201 AD2d 490, 491 [1994]).

At this juncture, there is no basis to conclude that all of the subject evidence is inadmissible. In fact, significant competent evidence in admissible form was elicited at the CPL article 440 hearing from disparate and wholly unrelated sources. This evidence warrants a new trial.

At the original trial, the defendant's repudiated confession was the most compelling evidence elicited by the prosecution. Arguably, it was the linchpin of the prosecution's case. The *Miranda* aspects of this case have been extensively litigated and will not be revisited. However, when the evidence presented at the CPL article 440 hearing is evaluated against the backdrop of the trial evidence, including the defendant's confession, how the confession was obtained, and the fact that the defendant almost immediately recanted the confession, the newly-discovered evidence is "of such character as to create a probability that had such evidence been received at the trial the verdict would have been more favorable to the defendant" (CPL 440.10 [1] [g]).

### B. CPL 440.10 (1) (h)

█ Nonetheless, the County Court properly denied that branch of the defendant's motion pursuant to CPL 440.10 (1) (h) which was to vacate the judgments of conviction on the ground of actual innocence. The defendant did not establish entitlement to this relief. In making our determination, we do not decide the contention, advanced by the defendant, that New York recognizes a free-standing claim of actual innocence that is cognizable by, or which may be addressed within the parameters of, CPL 440.10 (1) (h).

### V. Conclusion

Accordingly, the order dated March 17, 2006, is modified, on the law, the facts, and as a matter of discretion in the interest of justice, by deleting the provision thereof denying that branch of the defendant's motion pursuant to CPL 440.10 (1) (g) which

was to vacate the two judgments rendered October 23, 1990, based upon newly-discovered evidence and substituting therefor a provision granting that branch of the motion; as so modified, the order is affirmed, the two judgments rendered October 23, 1990, and the sentences imposed thereon are vacated, and we remit the matter to the County Court, Suffolk County, for a new trial, to be conducted with all convenient speed.

In light of our determination, we need not consider the defendant's remaining contentions.

KRAUSMAN, FLORIO and DILLON, JJ., concur.

Ordered that the order dated March 17, 2006, is modified, on the law, the facts, and as a matter of discretion in the interest of justice, by deleting the provision thereof denying that branch of the defendant's motion pursuant to CPL 440.10 (1) (g) which was to vacate the two judgments rendered October 23, 1990, based upon newly-discovered evidence and substituting therefor a provision granting that branch of the motion; as so modified, the order is affirmed, the two judgments rendered October 23, 1990, and the sentences imposed thereon are vacated, and the matter is remitted to the County Court, Suffolk County, for a new trial, to be conducted with all convenient speed.