People v Townsend (2025 NY Slip Op 51718(U))

[*1]

People v Townsend

2025 NY Slip Op 51718(U)

Decided on October 15, 2025

Supreme Court, Kings County

Moses, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on October 15, 2025
Supreme Court, Kings County

The People of the State of New York,

against
Kevin Townsend, Defendant.

Indictment No. 2159/2007

For the People: Steven Bravo, Esq. and Marie John-Drigo, Esq., Kings County District Attorney's Office
For Defendant: Jonathan Rosenberg, Esq. and Howard Greenberg, Esq.

H. Jacob Moses, J.

By motion dated September 14, 2023, the defendant moved to vacate his judgment of conviction pursuant to Criminal Procedure Law (CPL) section 440.10, entered on April 7, 2009, following a trial by jury, convicting the defendant of one count of Murder in the Second Degree and one count of Criminal Possession of a Weapon in the Third Degree, and imposing a sentence of twenty years to life on the murder conviction and seven years imprisonment and three years' post-release supervision on the firearm conviction, to run concurrently to each other (Marrus, J., at trial and sentence). The defendant alleged the grounds of newly discovered evidence based upon recanted testimony of eyewitness Ryan Hernandez, which was provided falsely at trial. The People opposed the facts as presented in the defendant's motion, but did not oppose an evidentiary hearing. This court held the motion in abeyance and conducted a hearing on August 27, 2024, August 28, 2024, September 4, 2024, January 30, 2025, June 4, 2025, and July 28, 2025. The defendant called one witness. The People called two witnesses. The following constitutes the court's findings of fact and conclusions of law.
Facts
On August 13, 2006, a basketball tournament was being held at the Lafayette playground. The defendant and Pleazoure Bonds, the decedent were playing on opposite teams. During the game, the defendant fell and claimed that the decedent committed a foul. The defendant and decedent argued. The defendant threatened to "pop" the decedent. The argument subsided, and the game continued. Towards the end of the game, the defendant went to a backpack on the sideline and changed his clothes. The defendant was overheard saying he was going to "pop someone." The defendant then approached the decedent while holding a firearm. The defendant and decedent tussled and the defendant pointed the firearm at the back of the decedent's neck. The defendant shot the decedent, striking him in the back of his left shoulder, causing his death. The defendant then fled. The defendant was subsequently arrested on February 23, 2007.
In January 2009, the defendant was tried before a jury. However, this first trial ended in a mistrial due to issues pertaining to deliberating jurors. The defendant was re-tried in 2010. Ryan [*2]Hernandez testified at trial. He testified that he heard the defendant threaten to shoot someone and that he saw the defendant with a firearm near the decedent seconds before the gunshot. Hernandez did not actually see the defendant shoot the decedent. When Hernandez heard the gunshot, he ran away, and did not see where the defendant went. Hernandez testified that he was friends with the decedent since they were both little and that they grew up together. Hernandez was not friends with the defendant but had seen him around the neighborhood.
Hernandez testified that he did not speak with the police regarding the shooting until after he was arrested for jaywalking. When asked, Hernandez told the police he was present during the shooting. Hernandez viewed photographs and identified the defendant.
In addition to Hernandez's testimony, the People called four additional eyewitnesses. Quincy Douglas testified that he was at the basketball game. Douglas knew the decedent for years and knew the defendant from the neighborhood. During the game, the defendant tripped and the decedent helped the defendant. The defendant and decedent then argued, and the defendant threatened to shoot the decedent. Later in the game, Douglas observed the defendant holding a firearm, walk up to the decedent, and pointed the firearm at the decedent. Douglas testified that he saw the defendant shoot the decedent. The defendant fled and Douglas went over to the decedent. Douglas subsequently identified the defendant in a lineup and again in court during his testimony.
Christopher Dent testified that he observed the decedent arguing with the defendant. Dent suggested to the coach to take the decedent out of the game, which he did. Towards the end of the game, the defendant removed himself from the game, went to a bookbag at the corner of the park, and change his clothes. Dent decided to leave the game, believing there would be trouble. Dent went to his car to call 911 when he heard a gunshot coming from the park. Dent saw the defendant to be the first person to run out of the park. Dent saw the decedent laying on the ground. Dent subsequently identified the defendant in a lineup and again in court during his testimony.
Thomas Spoto testified that he was the coach for the decedent's basketball team. During the game, the decedent got into a dispute with the defendant. Spoto did not know the defendant. Dent took the decedent out of the game because he thought there might be a fight. Spoto then observed the defendant leave the game. Spoto then heard screaming and when he looked, he observed the defendant and the decedent fighting, and that the defendant was holding a firearm. Spoto then heard a gunshot and observed the decedent on the ground. Spoto did not see where the defendant went. Spoto subsequently identified the defendant in court during his testimony.
Patricia Obleanis testified that she was the decedent's girlfriend and at the basketball game. She did not know the defendant. During the game, the decedent committed a foul against the defendant. The decedent and the defendant argued and pushed each other. The decedent was then taken out of the game. A few minutes later, she observed the defendant leave the game, go to the far corner of the park, and bend down. The defendant returned and approached the decedent. The defendant and decedent got into a fight, punching each other. Obleanis observed the defendant display a black object, which she then saw to be a firearm. She observed the defendant point it downward towards the decedent when he was leaning down, at the back of his neck. Obleanis then heard a gunshot and saw the decedent fall to the ground. The defendant then ran from the park. Obleanis subsequently identified the defendant in court during her testimony.
The defendant was subsequently convicted of Murder in the Second Degree and Criminal Possession of a Weapon in the Third Degree. The defendant was sentenced to twenty-five years [*3]to life for the murder conviction and seven years' imprisonment and three years' post-release supervision for the weapons conviction. The sentences were ordered to run concurrently to each other.

Procedural History
The defendant appealed his judgment of conviction. The defendant claimed that the People failed to prove beyond a reasonable doubt that the defendant intended to kill the decedent, that the court improperly charged the jury on Manslaughter in the First Degree and failed to properly define serious physical injury, and that he was denied the effective assistance of counsel because his attorney failed to preserve the charge issue for appeal.
The Appellate Division, Second Department affirmed the judgment of conviction (People v. Townsend, 83 AD3d 969 [2d Dept 2011]). The Court held that the evidence was legally sufficient to sustain the murder conviction, that the verdict was not against the weight of the evidence, and that the trial court properly instructed the jury on the lesser-included offense of Manslaughter in the First Degree.
The Court of Appeals denied the defendant's application for leave to appeal (see People v. Townsend, 17 NY3d 810 [2011]).
On May 1, 2012, the defendant moved to vacate his judgment of conviction pursuant to CPL § 440.10. The defendant contended that he was denied his right to a fair trial when the trial court participated in a read-back to the jury of testimony of three prosecution witnesses and that his attorney failed to object to the court's participation, rendering him ineffective.
In a Decision and Order dated July 11, 2012, the defendant's motion was denied (see Decision and Order dated July 11, 2012 [Marrus, J.]).
The defendant appealed the court's Decision and Order dated July 11, 2012. The Appellate Division, Second Department granted the defendant's request for leave to appeal, but affirmed the trial court's order (see People v. Townsend, 120 AD3d 595 [2d Dept 2014]).
The Court of Appeals denied the defendant's application for leave to appeal (see People v. Townsend, 25 N3d 1078 [2015]).
The defendant now moves, for the second time, pursuant to CPL § 440.10, to vacate his judgment of conviction. Specifically, the defendant argues that there is newly discovered evidence, by way of an affidavit from Hernandez, that Hernandez was pressured by the police to testify falsely that the defendant was the shooter. The People opposed the facts as presented in the defendant's instant motion, but did not oppose an evidentiary hearing.
On June 18, 2024, this court granted the defendant's motion, only to the extend of ordering a hearing on consent of the People.

Hearing Testimony
This court conducted a hearing on August 27, 2024, August 28, 2024, September 4, 2024, January 30, 2025, June 4, 2025, and July 28, 2025. Ryan Hernandez testified on behalf of the defendant. Former Assistant District Attorney Phyllis Chu and now-retired Detective Angel Sanchez testified on behalf of the People. The court finds Hernandez's testimony to be complete incredible. The court finds former Assistant District Attorney Chu's and now-retired Detective Sanchez's testimonies to be credible.
Hernandez testified that he was before the court on his own free will, that no one was paying him for his testimony, and that he had not spoken to the defendant or his family. Hernandez stated he wanted to do the right thing because he is now a practicing Jehovah Witness and wanted to clear his conscious.
Hernandez testified that he did not know the defendant, but was told by people in the neighborhood that "Fresh" is the defendant. Hernandez admitted that in October 2006, he wrote a statement for the police identifying the defendant as the shooter of the decedent. However, he retracted that he was at the scene or saw the defendant shoot the decedent in a January 2020 affidavit. Hernandez affidavit stated that after he was arrested in October 2006 for an unrelated, petty offense, he was asked if he knew anything about a shooting in the neighborhood. Hernandez told the police that he had heard about a shooting. The police then showed Hernandez a wanted poster of the defendant and told Hernandez that the defendant was the shooter. Hernandez claims that he told the police he was not there but that the police coerced him into helping identify the defendant as the shooter in exchange for being able to go home. Thus, Hernandez lied and told the police what they wanted to hear in exchange for being allowed to go home after a petty arrest. Hernandez testified that if he identified the defendant as the shooter, the police would help him get out of his current situation and be released.
Hernandez testified that he believed the detectives would let him go if he wrote out a statement that the defendant was the shooter. He did not anticipate it leading to him having to testify at a murder trial.
Hernandez testified that he had heard that someone got shot in Lafayette Park and that he made up the rest without speaking to any of the trial witnesses. He also did not speak to anyone between writing the statement for the police and testifying at the defendant's first trial.
Hernandez said that when he testified at both trials that there was an altercation between the defendant and the decedent over a game, he was not being truthful, and only said that because that was what the police wanted to hear. He does not know if the defendant shot the decedent, who is Hernandez's friend. He believed that the defendant was the shooter because he was relying on what his friend told him, not his own personal knowledge of the incident.
When Hernandez testified at the defendant's first trial, he did not believe he was there on his own free will, but because he was subpoenaed. Hernandez did not want to be there and he did not want to testify. Hernandez, fearing going to jail if he didn't testify, reluctantly did, despite knowing it was not truthful. Hernandez stated that when he testified at both trials, he lied and embellished what he had heard. Despite claiming that he lied during his trial testimony, at no point did he ever inform the Assistant District Attorney that he had lied. Hernandez testified that he is a pretty good liar and that he embellishes a lot, but that he was telling the truth now when he claims he made up written statement and trial testimony.
Former Assistant District Attorney Phyllis Chu and now-retired Detective Angel Sanchez testified on behalf of the People. Former Assistant District Attorney Chu testified that he was the prosecutor for both trials. She recalled meeting with Hernandez and discussing his statement that he made to the police. Chu stated that Hernandez was not very cooperative for the first trial, but more cooperative for the second trial. Chu never told Hernandez to lie.
Detective Sanchez testified that he was assisting the case detective in the investigation of the decedent's murder. In his capacity, he interviewed Hernandez in October 2006, after he was arrested for riding a bicycle on a sidewalk. Detective Sanchez did not speak to Hernandez about his current arrest, but rather if he knew anything from the neighborhood. Detective Sanchez did not make any promises to Hernandez and described Hernandez as calm and non-combative. Hernandez then told Detective Sanchez about the defendant. Detective Sanchez asked Hernandez to write out his statement, and Hernandez complied.
Detective Sanchez did not provide any details or information about the homicide and did [*4]not tell Hernandez to lie. Based on his conversation with Hernandez, Detective Sanchez created a photo array, inclusive of the defendant's photo. He showed it to Hernandez and within seconds, Hernandez identified the defendant and the one who killed the decedent.
Detective Sanchez did not testify at the defendant's first trial, but did testify in the second trial.

Conclusions of Law
CPL section 440.10(1)(g) empowers a trial court to vacate a conviction on the basis of newly discovered evidence "which could not have been produced by the defendant at the trial even with due diligence on his part and which is of such character as to create a probability that had such evidence been received at the trial the verdict would have been more favorable to the defendant; provided that a motion based upon such ground must be made with due diligence after the discovery of such alleged new evidence." The burden is on the defendant on a CPL § 440.10 motion; as the Court of Appeals has explained previously, "the statute is plain that the initial failure by a defendant to carry his or her burden of coming forward with sworn allegations substantiating the essential facts in the 440 motion does not shift the burden to the People in their responsive pleadings" (People v. Wright, 27 NY3d 516, 522 [2016]).
In order to vacate a judgment of conviction based on newly discovered evidence, a defendant must establish: (1) that the evidence in question is of such character that it would probably change the results if a new trial were held; (2) that it was discovered since the trial; (3) that it would not have been produced at trial with the exercise of due diligence; (4) that it is not cumulative; (5) that it is material to the issues; and (6) that it must not merely contradict the former evidence (People v. Spencer, 208 AD3d 1370, 1371 [2d Dept 2022]; People v. Hargrove, 162 AD3d 25, 55 [2d Dept 2018]). The first three criteria listed above have an explicit basis in CPL § 440.10(1)(g), "while the latter three criteria have been derived exclusively from case law and should be used to evaluate the ultimate issue of whether the new evidence would create a probability of a more favorable verdict (Spencer, 208 AD3d at 1371; Hargrove, 162 AD3d at 60; CPL § 440.10[1][g]). However, "[c]ase law from the Appellate Divisions reinforces the view that impeachment evidence may properly form the basis for a new trial where it is of such weight that it would create a probability of a more favorable verdict" (Hargrove, 162 AD3d at 58). "In order to fully appreciate the likely effect of the new evidence at the trial, it must be considered in the context of the relative strength of the People's evidence of guilt" (Spencer, 208 AD3d at 1371, citing Hargrove, 162 AD3d at 66). In People v. Tankleff, the court held that in deciding a CPL § 440.10(1)(g) motion, the hearing court is obligated to conduct a critical analysis of the proffered new evidence and cannot merely engage in the mechanical exclusion of such evidence (see People v. Tankleff, 49 AD3d 160, 179-80 [2d Dept 2007]). At a hearing on a motion pursuant to CPL § 440.10(1)(g), the defendant has the burden of proving by a preponderance of the evidence every fact essential to support the motion (People v. Tucker, 40 AD3d 1213, 1214 [2007]); CPL § 440.40[6]).
In recognition of the fact that "[t]here is no form of proof so unreliable as recanting testimony" (People v. Shilitano, 218 NY 161, 170 [1916], rearg denied 218 NY 702 [1916]); see People v. Jenkins, 84 AD3d 1403, 1407 [2d Dept 2011], lv denied 19 NY3d 1026 [2012]), courts have set forth a list of factors to be considered where, as here, the newly discovered evidence is recantation evidence, i.e., "(1) the inherent believability of the substance of the recanting testimony; (2) the witness's demeanor both at trial and at the evidentiary hearing; (3) the existence of evidence corroborating the trial testimony; (4) the reasons offered for both the trial [*5]testimony and the recantation; (5) the importance of facts established at trial as reaffirmed in the recantation; and (6) the relationship between the witness and defendant as related to a motive to lie" (People v. Wong, 11 AD3d 724, 725-26 [3d Dept 2004], citing Shilitano, 218 NY at 170-172; see People v. Pringle, 155 AD3d 1660, 1660 [4th Dept 2017], lv denied 31 NY3d 986 [2018]; People v. Simmons, 20 AD3d 813, 815 [3d Dept 2005], lv denied 6 NY3d 758 [2005]). Another relevant factor is "whether the recantation refutes the eyewitness testimony of another witness" (People v. Lane, 100 AD3d 1540, 1541 [4th Dept 2012], lv denied 20 NY3d 1063 [2013]).
At the defendant's initial trial and re-trial, Hernandez testified that he was at the park where the defendant and decedent were playing in a basketball game. Hernandez said he heard the defendant threaten to shoot someone and that he saw the defendant with a firearm near the decedent seconds before the gunshot. Hernandez stated that he did not actually see the defendant shoot the decedent. When Hernandez heard the gunshot, he ran away, and did not see where the defendant went.
At the instant hearing, Hernandez testified that he was never at the park, that his testimony at the trials were "all lies," and that his testimony was not based on his own personal knowledge, but rather what he had heard around the neighborhood.
This court finds Hernandez's testimony to be absolutely incredible. During Hernandez's testimony at the instant hearing, he admitted that he is a "pretty good liar" and "can embellish on things a lot." Hernandez's testimony at the hearing is wholly contradictory to his testimony at the defendant's first and second trials, as well as inconsistent with the other eyewitnesses at the scene during the shooting (People v. Avery, 80 AD3d 982, 985 [3d Dept 2011], lv denied 17 NY3d 791 [2011]). In essence, Hernandez is now stating that he has no first-hand knowledge of the shooting. However, the trial evidence severely undermines Hernandez's credibility. At trial, multiple eyewitnesses testified that they observed the defendant and the decedent playing basketball and that they got into a scuffle. The defendant left the game and went to another area of the park where he changed his clothes. The defendant returned to where the basketball game was taking place, with a firearm in his hand, and got into another scuffle with the decedent. At this point, the defendant pointed and fired the firearm at the decedent, causing his death. The other eyewitnesses' account of what transpired is consistent with what Hernandez testified to at the defendant's first and second trials. Furthermore, it took Hernandez over a decade to come forward and now claim that he testified falsely at not only one, but at both of the defendant's trials.
However, even if assuming arguendo, this court credited Hernandez's testimony at this hearing, it does not constitute newly discovered evidence pursuant to CPL §440(1)(g) because this court finds that his testimony would not change the result if a new trial was held (see People v. Jefferson, 229 AD3d 723, 724 [2d Dept 2024]). If there was a new trial and he were to testify consistently to his CPL § 440.10 hearing testimony, all he could say is that he was not at the scene of the shooting and does not know who shot and killed the decedent. However, the People's four other eyewitnesses would testify that they saw the defendant retrieve a gun, scuffle with the decedent, and shoot the decedent in the back, causing his death. Additionally, the recantation evidence does not qualify as newly discovered evidence pursuant to CPL § 440.10(1)(g) because the issues raised in the affidavit and Hernandez's hearing testimony would merely impeach or contradict his own trial testimony, and the new evidence therefore is not "of such character as to create a probability that the verdict would have been more favorable to the [*6]defendant" had the evidence been introduced (People v. Miles, 136 AD2d 958, 959 [1988], lv denied 71 NY2d 971 [1988]). Therefore, this court finds that Hernandez's testimony is not newly discovered evidence warranting a vacatur of the defendant's conviction pursuant to CPL § 440.10(1)(g).
Accordingly, the defendant's motion to vacate his judgment of conviction is denied in its entirety.
The foregoing constitutes the decision and order of the court.
Dated: October 15, 2025
Brooklyn, NY
H. Jacob Moses, A.J.S.C.
Right to appeal:
You are advised that your right to an appeal from the order determining your motion is not automatic except in the single instance where the motion was made under C.P.L. section 440.30(1-a) for forensic DNA testing of evidence. For all other motions under Article 440, you must apply to a Justice of the Appellate Division for a certificate granting leave to appeal. THE APPLICATION MUST BE SENT TO THE APPELLATE DIVISION, SECOND DEPARTMENT, 45 MONROE PLACE, BROOKLYN, NY 11201. In addition, you must serve a copy of your application on the Kings County District Attorney, Renaissance Plaza, 350 Jay Street, Brooklyn, NY 11201. Do NOT send notice of appeal to the Supreme Court Justice who decided this motion.
This application must be filed within 30 days after your being served by the District Attorney or the court with the court order denying your motion. The application must contain your name and address, indictment number, the question of law or fact which you believe ought to be reviewed and a statement that no prior application for such certificate has been made. You must include a copy of the court order and a copy of any opinion of the court.